JoNes, Senior Judge,
delivered the opinion of the court:
The plaintiff, Food Machinery and Chemical Corporation, sues for an alleged overpayment of Federal income taxes for the year 1949 caused by the defendant’s disallowance of a deduction to plaintiff for depletion of mineral deposits in that year. The amount claimed by the plaintiff as percentage depletion allowance is $71,778,[1] which, if allowed, will cause a reduction of plaintiff’s 1949 income tax in a proportionate amount and a refund will be in order.
The issues presented are (1) did the taxpayer possess the requisite economic interest in the mineral in place, and if it did; (2) what is the proper cutoff point in the processing of the mineral for determining the amount of the depletion deduction to be allowed %
THE PACTS
The pertinent facts need some elaboration. For over half a century plaintiff has been engaged in the manufacture of phosphate chemicals at its processing plant in Carteret, New Jersey. The basic raw material used by plaintiff is elemental phosphorus which, in 1944, was being produced by electric furnaces at the phosphate mines in Florida and Tennessee. Since these suppliers were also competitors of plaintiff, i.e., they were integrated producer-users, plaintiff was experiencing difficulty in obtaining elemental phosphorus. Plaintiff therefore decided in 1944 to commence production of its own elemental phosphorus and began in *316 vestigating for deposits of phosphate shale. The deposits lay in Florida and Tennessee, which already were overcrowded, and the Intermountain Western States of Wyoming, Utah, Idaho and Montana. At that time there were no producers of elemental phosphorus outside Florida and Tennessee.
In late 1946 plaintiff was contacted by the Simplot Co. concerning phosphate deposits on the Fort Hall Indian Eeservation near Pocatello, Idaho. Simplot was lessee of the mineral rights to this area and had been conducting mining operations since the summer of that year. Two distinct mineral deposits were located there, each in a separate layer in the ground. The lower layer was the more valuable mineral and was termed “phosphate rock.” It assayed 30 percent or greater P2 0B and was directly usable in Simplot’s fertilizer plant at Pocatello. The upper layer, which necessarily had to be extracted in order to mine the “rock,” was termed “phosphate shale.” [2] It contained less than 30 percent P2 05 and could only be used in the manufacture of fertilizer by first passing it through a very expensive middle process called “beneficiation.” The only other feasible use for the shale was to process it in an electric furnace and produce liquid elemental phosphorus. This was also a very costly undertaking.
During the initial phases of mining by Simplot, the rock was transported to its fertilizer plant and the shale was piled on the surface near the mine. After several months of mining operations, it became evident to Simplot that a use for the shale would have to be found in order to make the continued mining of rock economical. Simplot discussed financial arrangements with several compames concerning the construction of an electric furnace but was unsuccessful either in acquiring backing or in inducing someone else to build it. The cost of one furnace was estimated at between $2,500,000 and $3,500,000.
When plaintiff was contacted in late 1946, it sent its own mining engineers to Idaho to investigate the deposits. It was soon evident that several electric furnaces would need to be *317 constructed to make the venture economically feasible, and that a minimum of 25 years’ supply of shale would also be necessary to recoup the $10,000,000 to $20,000,000 investment. Simplot’s and plaintiff’s engineers, working together, determined that sufficient reserves were available in place to guarantee plaintiff sufficient shale input to four furnaces for at least 25 years. Once this was known, formal negotiations commenced between the two companies.
In the fall of 1946 when Simplot realized the need for an electric furnace, it had requested the Secretary of the Interior to lease additional lands up to 2,500 acres in order to secure the reserves necessary to warrant a multimillion dollar investment. Later, when it was known that plaintiff would be the one constructing the furnaces, the final details of the 25-year Indian leases were completed. Plaintiff played an important but unofficial part in these lease negotiations.[3]
The 1947 Indian leases called for a royalty of 30 cents per ton on the rock and 10 cents per ton on the shale. These were subject to adjustment to market price after 10 years. The lease was terminable if the lessee (Simplot) or its associates failed to install an electric furnace on or near the Tudia.n Beservation within 15 years. Although the plaintiff was not named in these leases, it was understood by both the lessor (Indians) and the lessee (Simplot) that plaintiff would be the associate installing the furnaces, using the shale and paying the 10 cents per ton royalty to the lessor. At this time there was no other known deposit of shale which could economically be used in plaintiff’s proposed furnaces. Therefore, plaintiff’s furnaces, once constructed, would be entirely dependent upon the shale from Simplot’s leases. Eemoval of this supply of shale would necessitate scrapping the entire investment by plaintiff.[4]
In November of 1947, 4 months after the Indian leases were completed, plaintiff and Simplot finalized their negotiations in an agreement entitled: “Agreement for purchase and sale of phosphatic shale from the Fort Hall Indian Beserva *318 tion.” [5] This agreement ivas submitted to and approved by the Assistant Secretary of the Interior. By its terms Sim-plot was to supply plaintiff all its requirements for shale in its furnaces at Pocatello. Plaintiff was restricted from producing fertilizer and Simplot, similarly, was restricted from selling or using phosphate for other than the production of fertilizers. The price for the shale was one dollar ($1.00) per ton and plaintiff was to pay the royalty directly to the lessor (Indians). Simplot was required to set aside reserves of phosphate to guarantee plaintiff a 25-year supply. These reserves could be increased whenever plaintiff installed more furnaces. If Simplot invaded these reserves in order to mine the rock, it had to store and preserve the shale for future use by plaintiff. These reserves would be released if plaintiff failed to construct its furnaces.
The Agreement between plaintiff and Simplot also allowed for plaintiff to take over the operation of the mine if Simplot either could not supply all of plaintiff’s shale requirements, or increased the price, or invaded the reserve in order to sell to others and did not replace with other reserves within 20 days. These operations would be at plaintiff’s expense but without any compensation or rental to Simplot. Royalties to the Indians would continue to be paid by plaintiff. Provisions were made to allow Simplot to regain possession of the mine whenever it was able to meet the conditions of the original Agreement. The Agreement was to remain in effect as long as the mining leases ran, and plaintiff had the right to correct any default by Simplot in order to keep the leases running.
During the negotiations between plaintiff and Simplot, plaintiff had offered to buy Simplot’s interests in the mine and, alternatively, to form a joint venture. Simplot was unwilling to agree to either of these two approaches. A lease and sublease was impractical because the rock and shale could not be mined by separate parties. Only one mining operation was feasible.
Events have occurred as follows since the signing of the Indian leases and the Agreement between plaintiff and Simplot. By 1959 Simplot had invested over $4,500,000 in *319 its fertilizer plant at Pocatello, and plaintiff bad invested almost $21,000,000 in its four electric furnaces and related plant equipment. All of the sbale processed in plaintiff’s plant has been from the Simplot mine and by 1957 all the shale deposits under Simplot’s leases had been reserved for plaintiff. Costs of exploration for reserves have been borne by both parties. No shale has been mined by Simplot and used by anyone other than plaintiff except by the consent of plaintiff. The costs of $1 per ton and the royalty have remained unchanged. In 1949, the year plaintiff commenced furnace operation, Simplot delivered over 180,000 tons of shale to plaintiff. By 1956 the annual supply was over 500,000 tons, with Simplot receiving over $500,000 and the Indians over $50,000 in royalties.
Simplot, by 1959, had spent almost $2,000,000 on the operation of the mine. Other expenses incurred in geological research of the area have been borne jointly. A railroad company was contacted by both plaintiff and Simplot in 1948 and induced to build a spur track at its own expense from the mine to the two plants near Pocatello.[6] The company was to be reimbursed 50 cents for each ton of rock or shale transported. Construction of the spur track was not economically feasible if only the rock were to be transported. Simplot’s fertilizer plant used about 36,000 tons of rock each year, whereas plaintiff’s four furnaces used about 500,000 tons of shale yearly. By 1954, plaintiff had paid the railroad over $1,000,000, compared to Simplot’s $152,000.
If these facts add up to the possession by plaintiff of an “economic interest” in the phosphate shale in place, then a depletion allowance should be granted. Before considering the law on this point, however, one further fact should be noted. In 1957 Simplot and plaintiff entered into a supplemental agreement which superseded the terms of “purchase and sale” contained in the original 1947 Agreement. The effective date of this new Agreement was contingent upon the issuance of a ruling by the Internal Revenue Service that the new contract gave plaintiff a depletable economic interest in the shale. A ruling favorable to the plaintiff was *320 made oil October 8, 1957. Until then, plaintiff bad not attempted to make deductions for depletion of tbe sbale.
In tbe new Agreement of 1957 plaintiff was granted a sublease on tbe sbale deposits in return for annual rental payments to Simplot. Simplot was to continue to mine botb tbe rock and shale, but was now termed an “independent contractor,” and would receive its mining costs from plaintiff. In essence, while the terms were altered, the substance of tbe Agreement remained unchanged. However, this does shed some light on tbe intent of the parties in their 1947 Agreement, and so will be referred to when “economic interest” is discussed.
ECONOMIC INTEREST
Whether a taxpayer is to be allowed a deduction for depletion of mineral deposits is entirely a matter of legislative grace. Parsons v. Smith, 359 U.S. 215, 219 (1959). The Corporation Tax Law of 1909, 36 Stat. 11, failed to provide for such a deduction and the hardship to mine operators resulting therefrom caused the Congress to make provision for a depletion deduction in the Revenue Law of 1913, 88 Stat. 114. United States v. Ludey, 274 U.S. 295, 302-303 (1927). This deduction has been continued in all Revenue Acts since then. Commissioner v. Southwest Expl. Co., 350 U.S. 308, 312 (1956).
The principle underlying the depletion allowance is the “recognition of the fact that the mineral deposits are wasting assets, and [the deduction for the depletion] is intended as compensation to the owner for the part used up in production.” Helvering v. Bankline Oil Co., 303 U.S. 362, 366 (1938). This exclusion from gross income “is designed to permit a recoupment of the owner’s capital investment in the minerals so that when the minerals are exhausted, the owner’s capital is unimpaired.” Commissioner v. Southwest Expl. Co., supra, at 312. The reasoning behind depletion is thus very similar to that supporting deductions for depreciation in other types of property subject to wear and exhaustion. United States v. Ludey, supra, at 303.
Since the depletion deduction was to allow the taxpayer to recover, by the time the mineral was completely exhausted, exactly his investment in the mine, Kirby Petroleum Co. v. *321 Commissioner, 326 U.S. 599, 603 (1946), the first few Keve-nue Acts provided that the depletion, allowance was to cease when the total deductions taken over the years added up to a sum equal to the original capital investment. The amount of the depletion deduction for any year was to be “reasonable” and it was left to the Commissioner of Internal Eevenue to determine a proper formula. This manner of calculating depletion proved very difficult, and so in the 1926 Act, 44 Stat. 9, a flat allowance of a set percentage of gross income was adopted. Helvering v. Twin Bell Oil Syndicate, 293 U.S. 312, 318 (1934), Kirby Petroleum Co. v. Commissioner, supra, at 603. This fixed manner of calculating depletion deduction has been continued to the present day, even though the resultant deduction is not equal to nor sometimes even related to the capital investment in the mineral deposit. “ [T]he taxpayer is not limited to a recoupment of his original investment [today]. The allowance continues so long as minerals are extracted, and even though no money was actually invested in the deposit.” Commissioner v. Southwest Expl. Co., supra, at 312.
The determination of what parties involved in mining operations are entitled to the depletion deduction has become very difficult. The statute in Section 23 (m)[7] calls for an equitable apportionment of the deduction between the lessor and lessee. Whether others can share in the deduction is not stated. In fact, not until the 1918 Kevenue Act, 40 Stat. 1057, did the Congress expressly state that a lessor and lessee should share the depletion deduction. Because of this lack of explicitness in the statute, the Supreme Court over the years has found it necessary to apply various fact situations to the statute language. A study of some of these decisions is helpful.
One of the first Supreme Court decisions dealing on this point was Lynch v. Alworth-Stephens Co., 267 U.S. 364 (1925). There, the taxpayer was lessee of iron ore deposits and desired to take depletion deductions on his gross income (the royalties he received from a sublessee) minus the royal *322 ties be paid to the lessor-fee owner. Tbe applicable statute at that time, Section 12(a) of the Revenue Act of 1916, 39 Stat. 756, 768, provided for “a reasonable allowance for the exhaustion * * * of property" [emphasis added], and made no mention of apportionment between lessor and lessee. The Court construed property as meaning a “real and substantial interest [in the mineral deposits],” (at 369), and not merely legal title therein.
This “broadening” of the relationship of taxpayer-to-mineral-deposit from the possible restricted connotation in the Revenue Acts, was added to in Palmer v. Bender, 287 U.S. 551 (1933). The Court was there concerned with the relationship of a transferor of oil leases who received as consideration for the transfer certain fixed amounts plus a continuing royalty of one-eighth of all oil produced. There was no lease here as there had been in Lynch and in Murphy Oil Co. v. Burnet, 287 U.S. 299 (1932); the decision in the latter case holding that both bonus and royalty payments are depletable. The Court in Palmer ruled that the granting or denying of a depletion allowance is not dependent on “the particular legal form of the taxpayer’s interest in the property * * [At 557.] "Whether the taxpayer leases the property, or assigns it, or transfers it in some other manner, is immaterial. The statute does not confine “depletion allowances to [only] those who are technically lessors.” [At 556.]
The language of the statute is broad enough to provide, at least, for every case in which the taxpayer has acquired, by investment, any interest in the oil [mineral] in place, and secures, by any form of legal relationship, income derived from the extraction of the oil [mineral], to which he must look for a return on his capital. [At 557.]
This economic interest [at 557] test developed by the Court in Palmer has been the rule used in all subsequent depletion cases.[8] It has also been adopted by the Commissioner in his Treasury Regulations.[9] This rule boils down to two tests for *323 economic interest: (1) A capital investment in the mineral in place, and (2) a return on the investment which is realized solely from the extraction of the mineral.
Since the Palmer opinion, most decisions ruling for a de-pletable interest have involved instances where the taxpayer “has once had at least a fee or leasehold in the [property].” Commissioner v. Southwest Expl. Co., 350 U.S. 308, 315 (1056). It is fairly obvious that a taxpayer can get in a position where he must look solely to the extraction of the mineral for a return on his investment, and yet not possess a lease or title. But, can the same taxpayer meet the other test requirement of Palmer and the Treasury Regulations if his investment is not in a lease or title to the property ?
In Helvering v. Bankline Oil Co., 303 U.S. 362 (1938), the Court ruled that a gasoline processor that receives its natural gas via its own pipelines running from the wellheads, and pays royalties to the well owners, has no economic interest in the gas in place, but merely an economic advantage acquired “through a contractual relation to the owner, * * [At 367.] The taxpayer did not meet either of the two tests; it could not compel production of gas at the well (i.e., no investment in the oil), and was not entirely dependent upon the gas well in question for a return on its investment.[10] Thus, in Bankline, the taxpayer’s lack of control over production of the mineral became one of the prime tests for determining whether it possesses an economic interest in the mineral.
The next case after Bankline dealing with taxpayers who have never possessed either a fee or leasehold interest in the property, was Commissioner v. Southwest Expl. Co., 350 U.S. 308 (1956). This is the leading case in which the Court has found an economic interest to exist -under these circumstances. However, in Southwest the facts were very unique and the Court was careful to limit its expansion of the Palmer concept to cover just these unique facts.[11] The State of California *324 required by law that all drilling for offshore oil must be done from filled lands or from upland sites and that permission from the upland owners was necessary to acquire a lease from the State. Southwest Exploration Company obtained a lease from the State to drill from specified upland sites, the upland owners having agreed to this use of their land in consideration of royalties from all future oil production. There were no filled lands available and so, without the consent of the upland owners, there could be “no bid, no lease, no wells and no production.” [At 315.] The State also could cancel the lease if Southwest defaulted in any of the conditions, including those with the upland owners.
The Court termed the upland owners as being “essential parties to any drilling operations.” Their “controlling position” over production was the drilling site which they could have sold but, instead, kept as their investment in the oil in place. They had to look solely to the oil production for a return on their investment and so met both tests of Palmer and the Treasury Regulations. Therefore, Southwest and the upland owners were required to share the depletion allowance.
Since the decision in Southnmst, the Court has considered two cases in which the facts were more near those of Banhlme than Southwest, and consequently, has ruled against a presence of an economic interest in both instances. Both cases involved owners or lessees of coal mines who had contracted with certain independent mine operators to have the operators mine the coal at their own expense and deliver it to the owner or lessee for a fixed sum. In the first of these cases, Parsons v. Smith, 359 U.S. 215 (1959), the contracts “were completely terminable without cause on short notice” [at 224], and all the investment of the operators was in their equipment which was movable and so not susceptible to scrapping if the mine closed down.
In Paragon Coal Co. v. Commissioner, 380 U.S. 624, (1965), underground mining instead of strip mining was involved and so the expense to the operators was greater than in Parsons and less of their investment was recoverable on termination. However, all the equipment was movable, all royalties were paid by the lessee, and the coal was delivered to the lessee. The operators had no obligation to continue mining— *325 whether the lessee could terminate as in Parsons was disputed. The lessee also controlled the price paid for the coal delivered. In both cases, the mine operators looked to the owner or lessee for a return on their investment, not to the sale of the coal.
Therefore, in both Parsons and Paragon the taxpayer failed to meet either of the two tests of economic interest. Although in both instances the operator conceivably had more invested and was taking a greater risk than the owner or lessee,[12] nevertheless the relationship of the operators to the coal in place was not strong enough.
We feel that the facts in the instant case are stronger on the issue of economic interest than even those present in Southwest, and we therefore find that the taxpayer, Food Machinery, has an economic interest in the phosphate shale in place. Our conclusion is based on the following enumerated circumstances which show conclusively that the taxpayer here has met both tests of economic interest — (1) capital investment in the mineral [shale], and (2) return on the investment based solely on the extraction of the shale.
The circumstances are these: (1) The decision of the taxpayer to construct the electric furnaces was the sine gua non of the mining of the shale by Simplot. This was as essential an element to the mining process as the agreement of the upland owners in Southwest, and was equally as irreplaceable. In both Parsons and Paragon other operators were available and so they were not essential parties. (2) The taxpayer had reserves in the shale in place for 25 years. It could compel production of this shale and prevent sales of it to anyone else.[13] (3) The lease by Simplot was terminable by the Indians if the taxpayer did not construct the electric furnaces. (4) The price paid by taxpayer to Simplot for the shale was not the market price but rather a fixed amount *326 which, covered mining expenses pins a 10 percent profit. (5) The taxpayer had its own geologists participate in studies of the mine and shared in various exploratory expenses. (6) The investment by the taxpayer in the electric furnaces and the payments to the railroad far exceeded the investment by Simplot. (7) The taxpayer was required to look solely to the shale in Simplot’s mine for a return on its $20,000,000 investment. There was no ,other supply of shale economically possible, and these multimillion dollar furnaces would need to be scrapped if the shale in the Simplot mine disappeared. (8) Simplot’s investment in the mine was dependent upon the taxpayer’s continued use of the shale. (9) The taxpayer paid royalties on the shale directly to the lessors and not via the lessee Simplot.
Can it be thought for a moment that any reasonable businessman would invest $20,000,000 in four huge immovable electric furnaces at a site completely isolated from all sources of raw input except one, and not first secure an ironclad guarantee to that lone raw input! We feel that this comprises a requisite capital investment in the mineral and is in line with the economic interest rule as laid down in Palmer and all the cases thereafter.[14]
The change in the agreement between Simplot and the taxpayer in 1957, and the favorable ruling by the Commissioner on depletable interest which the taxpayer acquired therefrom, we feel are insignificant in reaching our conclusion for the 1949 tax year. Whether the taxpayer thought it had a depletable interest prior to 1957, and whether the 1957 agreement significantly altered the essentials of the *327 1947 agreement (we feel it did not), cannot be given much, weight. It does bear on the intent of the parties but, we feel, in this case the intent at the time (1949) is conclusively made apparent from the facts present then.
DEPLETION CUTOEF POINT
It now becomes necessary to determine the proper cutoff point for calculating the depletion deduction — the fine line where the mining process ceases and the manufacturing process begins. This point can be any one of four places: the rough shale loaded in gondola cars at the Simplot mine, the rough shale loaded in the Idln feed bins at plaintiff’s plant, the nodulized shale prior to entry into the electric furnaces, and the liquid elemental phosphate loaded in tank cars outside the plant.
Section 114(b) (4) of the Internal Eevenue Code of 1939[15] provides that the percentage depletion for “phosphate rock”[16] shall be 15 percent “of the gross income from the property,” and Section 114(b) (4) (B) further defines gross income from property as that derived “from mining.” The term “mining” is defined as including “not merely the extraction of the ores or minerals from the ground but also the ordinary treatment processes normally applied by mine owners or operators in order to obtain the commercially marketable mineral product or products.”
This subsection lists some “ordinary treatment processes” but does not include any for phosphate rock. (This includes rock and shale.) It becomes necessary, therefore, to determine the ordinary treatment process for the mineral involved in this case — phosphate shale.
The Supreme Court has handed down several important decisions in this area. The landmark case is that of United States v. Cannelton Sewer Pipe Co., 364 U.S. 76 (1960). The taxpayer there was an integrated miner-manufacturer of clay pipes produced from fire clay and shale. There was a substantial market for the fire clay and shale in the vicinity but the taxpayer could only make profitable sales on the finished product — clay sewer pipes. Fire clay and shale *328 were not enumerated in the [Revenue Code [Sec. 114(b) (4) (B)] as having a specific ordinary treatment process. The Court noted, however, that of the four categories of permissible processes, none of them “destroy the physical or chemical identity of the minerals or permit them to be transformed into new products.” [At 86.] The Court then concluded, “that Congress intended to grant miners a depletion allowance based on the constructive income from the raw mineral product, if marketable in that form, and not on the value of the finished articles.” [At 86.]
In applying the facts to the conclusions of law, the Court determined that the vast sales of the raw product — fire clay and shale — in the vicinity was conclusive of the “commercial marketability of the product” in its raw state. The Court further stated that this proof of marketability was not significant in showing that the taxpayer could sell the raw product profitably — which he could not do — “but” because these sales demonstrated that the raw product was in a state “ready for industrial use or consumption” and had thus passed the mining stage.
It was further stated that the Congress intended for all miners of the same product to be treated similarly as to depletion allowances. This applies whether they are integrated miner-manufacturers or merely miners. This meant that the taxpayer’s depletion allowance was to be governed by the ordinary processes applied by the nonintegrated miners prior to sale.
In Riddell v. Monolith Portland Cement Co., 371 U.S. 537 (1963), the Court in a per curiam opinion held that the cutoff point for an integrated mines-manufacturer of cement was the value of the limestone rather than the finished cement. There were substantial sales of limestone in the vicinity as in Oawnelton and the Court stated that Oannelton placed the cutoff point “at the point where the mineral first became suitable for industrial use or consumption.” [At 538.]
The law concerning cutoff therefore appears to place the “line” at the place where the mineral first becomes fit for “industrial use or consumption.” This is measured on an industry-wide basis to afford an equitable treatment to all similarly situated taxpayers. The best test for determining *329 when a mineral is fit for “industrial use or consumption” is its marketability by other producers who are nonintegrated. However, when there are no other producers of any significance in. the market area,, then other tests must be utilized in determining “readiness for industrial use or consumption.” Turning to the statute and the opinion in Oannelton, it appears that one test is “where does the mineral undergo its first chemical or physical change.” This test also seems reasonably in line with the ordinary meaning of the phrase “mineral product.”
Turning once again to the controversy at hand, the facts show that there were no significant sales of low-grade phosphate rock (shale) in the vicinity or elsewhere during the tax year.[17] No quotations existed for that type of mineral. The only use for shale was as input to. an electric furnace to produce liquid elemental phosphate. This liquid was then marketable and usable in chemical plants to produce various chemical products. No market existed for the mineral in any of the stages prior to the elemental phosphate. The only other producers of elemental phosphate from shale were located in distant Florida and Tennessee.
If the Supreme Court in Oannelton used the evidence of substantial marketability as the sole determiner of “suitability for industrial use or consumption,” then the liquid elemental phosphate is the proper cutoff point between mining and manufacturing in this case. However, as previously stated, this is not our interpretation of that decision.
In construing the ordinary treatment processes enumerated in the Revenue Act, we point out again that the Court in Oannelton found that none of them allowed a process that would change the physical or chemical make-up of the product. Also important in construing the statutory meaning is the “exclusion” in part (iv) of enumerated processes of “thermal or electric smelting or refining,” as allowable processes. This, of course, does not refer specifically to phosphate rock but it does apply to “ores which are not customarily sold in the form of the crude mineral product.” It is proper to study these enumerated processes, even though not directly ap *330 plicable to the mining of phosphate rock, in order to gain an insight into the congressional intent for the entire section.
Another factor of possible significance in determining congressional intent in the processing of phosphate rock is that in the Internal Revenue Code of 1954, 68A Stat. 3, 210, Sec. 613(c) (4) (E), an ordinary treatment process for that mineral appeared. It was listed as “the sintering and nodulizing of phosphate rock.” Nodulizing is the intermediate process wherein the chunks of rough shale are passed through a rotating kiln and heated. This process causes a physical change in that it melts the surface slightly and hardens it. This nodulizing process makes the shale suitable for processing in the electric furnaces. A chemical change also occurs in nodulizing in that fluorine is released from the fluorapatite compound in the shale, leaving tricalcium phosphate. There was no market for these nodules either.
The resulting nodules are then mixed with coke and silica (85 percent nodules, 10 percent coke, and 5 percent silica) and processed in an electric furnace where the phosphorus is released in a gaseous state. It is then cooled to a liquid and shipped to the plaintiff’s chemical plant in New Jersey. There is a chemical and physical change in this “reduction and thermal or electric smelting process.”
Since both chemical and physical changes occur during nodulizing and electric furnace processing, these processes must be construed as being outside the “ordinary treatment process of miners.” The fact that the Congress saw fit in 1954 to change the law is not a controlling factor in our construction of its intent in the 1939 Code.
The remaining possible cutoff points are the rough shale loaded in gondola cars at the Simplot mine, and the same shale loaded in kiln feed bins at the taxpayer’s Pocatello plant. In both these instances the shale has been crushed and screened to limit the size to three (3) inches. The only difference is the 21 miles of hauling from the mine to the furnaces.
We find that the shale at the mine was ready for industrial use or consumption as evidenced by its use in the taxpayer’s plant. The transportation of the shale from the mine to the plant occurred after the mineral was ready for indus *331 trial use or consumption and so was part of the post-mining process. The cutoff point where gross income from mining ceases “has been the same ever since the first depletion statute, namely, ‘where the ordinary miner shipped the product of his mine.’ ” Riddell, at 539. This is the shale loaded “at the mine.”[18]
Since the parties have stipulated on the amount of the depletion allowance for all four possible cutoff points, it becomes unnecessary to consider whether Simplot and the taxpayer should share in the depletion of the shale, and what each proportionate share should be.
The proportionate profits method will be used in determining the value of the shale at the mine.
Accordingly, judgment is entered for plaintiff with the amount of recovery to be determined pursuant to Eule 47(c) (2) of the Eules of this court.
FINDINGS OP FACT
The court, having considered the evidence, the report of Trial Commissioner Eoald A. Hogenson, and the briefs and argument of counsel, makes findings of fact as follows:
1. Plaintiff is and was a Delaware corporation, being the surviving corporation in a statutory merger of Food Machinery Corporation and Westvaco Chemical Corporation, formerly known as Westvaco Chlorine Products Corporation. Eeference to plaintiff includes Westvaco Chlorine Products Corporation and Westvaco Chemical Corporation. Plaintiff’s principal office is located at San Jose, California.
2. The tax involved in this case is corporate income tax paid by plaintiff to defendant for the calendar year 1949. Plaintiff filed a timely corporate income tax return for the calendar year 1949 on June 15, 1950, with the Collector of Internal Eevenue for the First District of California (sub *332 sequently designated the District Director of Internal Eeve-nue, but herein referred to as the “Collector”). Plaintiff’s books of account are and were maintained on the accrual method of accounting and its return was prepared accordingly.
3.In its corporate income tax return for the calendar year 1949 plaintiff reported an income tax liability of $2,415,-655.58. Plaintiff paid to the Collector the amount of its income tax liability disclosed by its return as follows:

Date of payment Amount

March 13,1950_ §625,000.00
Jane 15, 1950_ 582, 827. 79
September 13, 1950_ 603,913.90
December 13,1950_ 603,913.89
Total_ 2,415, 655.58
4.The Commissioner of Internal Eevenue, upon audit and review of plaintiff’s income tax return for the calendar year 1949, determined a deficiency in plaintiff’s income tax for that year in the amount of $192,647.38. This amount was occasioned by certain uncontested adjustments made by the Commissioner of Internal Eevenue to plaintiff’s taxable income for that year. The asserted deficiency was assessed and was paid by plaintiff, together with interest thereon, to the Collector as follows:

5.During the calendar year 1949, in addition to its other business activities, plaintiff was engaged in the production of elemental phosphorus from phosphate shale mined and delivered to plaintiff pursuant to a certain Eevised Agreement dated March 29,1948, referred to in finding 49 hereof, from phosphate rock and shale deposits on the Fort Hall Indian Eeservation under certain 1947 Indian leases referred to in finding 38 hereof. The “shale” was actually low-grade phosphate rock, as defined in finding 16.
*333 6. In computing its income tas liability for the calendar year 1949 in its income tax return for that year, plaintiff did not claim any deduction for percentage depletion with- respect to the phosphate shale mined and delivered to plaintiff during that year from said Fort Hall phosphate rock and shale deposits.
7. In computing the asserted deficiency in plaintiff’s income tax for the calendar year 1949 referred to in finding 4 above, the Commissioner of Internal Eevenue did. not allow to plaintiff any deduction for percentage depletion- with respect to the phosphate shale mined and delivered to plaintiff during that year from said Fort Hall phosphate rock and shale deposits.
8» On December 15,1958, plaintiff filed with the Collector a timely claim for refund of income tax exacted for the calendar year 1949 in the amount of $30,234.68 plus statutory interest thereon. The basis of plaintiff’s claim for refund was the allegation that plaintiff was and is entitled to a deduction for percentage depletion in the amount of $79,565 with respect to the phosphate shale mined and delivered to plaintiff during 1949 from said Fort Hall phosphate rock and shale deposits in which plaintiff possessed á depletable economic interest and that the failure by plaintiff to claim such deduction in its income tax return for the calendar year 1949 and the failure by the Commissioner of Internal Eeve-nue to allow such deduction to plaintiff in his determination of plaintiff’s income tax liability for that year were in error.
The amount of percentage depletion claimed by plaintiff was based on elemental phosphorus loaded for shipment in railroad tank cars as the proper point for the measurement of plaintiff’s gross income from mining, or in the alternative on the measurement of plaintiff’s gross income from mining at such other point in the processing of said shale as will include the ordinary treatment processes recognized by law.
9. Plaintiff’s petition was timely filed in this court ‘ on August 22, 1959. The grounds upon which this case was presented and tried are the same as those stated in plaintiff’s claim for refund.
10. In accordance with the provisions of section 6532(a) (1) of the Internal Eevenue Code of 1954, the Commissioner of Internal Eevenue notified plaintiff of the disallowance of *334 its claim for refund on September 11, 1959, after plaintiff had filed the petition in this case.
Defendant’s contention is that plaintiff had no economic interest in the phosphate shale in place, and that even if plaintiff did have such an economic interest, the proper point for the measurement of plaintiff’s gross income from mining was the shale loaded for shipment at the mine.
No part of any sum representing the instant claim which was collected from plaintiff as aforesaid by the Collector has been refunded, repaid, or credited to plaintiff.
11. Since the turn of the century plaintiff has been engaged in the maziufacture of phosphate chemicals at its processing plant at Carteret, New Jersey. During its early years these chemicals were produced from phosphate rock mined abroad or in Florida which was purchased by plaintiff and converted to phosphoric acid. As its needs expanded, plaintiff purchased quantities of phosphoric acid to supplement the amounts it produced. In the late 1930’s or early 1940’s plaintiff commenced purchasing elemental phosphorus, proceeded to shut down its facilities for production of phosphoric acid, and elemental phosphorus became the fundamental raw material used by plaintiff in its Carteret processing plant. By the beginning of 1947 plaintiff was dependent entirely on purchased elemental phosphorus.
12. The increased demand for phosphate chemicals at the end of World War II made supplies of elemental phosphorus increasingly difficult for plaintiff to obtain. Plaintiff’s suppliers were also competitors and soon grew unwilling to sell even limited quantities of elemental phosphorus to plaintiff. It became evident that if plaintiff wanted to maintain its position in the phosphate industry and meet the growing demand for phosphate chemicals, plaintiff would have to become a producer-user of elemental phosphorus rather than a purchaser-user.
13. Beginning in 1944, plaintiff started a thorough investigation of the areas containing phosphate rock deposits and the economics involved in the producing of elemental phosphorus in each area. Of the three major areas in the United States containing phosphate rock deposits (Florida, Tennessee, and the Intermountain Western States of Wyoming, *335 Utah, Idaho and Montana) Florida and Tennessee were felt to be already crowded. Plaintiff was engaged in mining other minerals in Nevada, California and Washington, as well as in the development of an extensive trona deposit in Wyoming. It was decided to concentrate plaintiff’s investigation on the Intermountain Western area. Phosphate rock deposits on private property and on Government property were examined, and by mid-1946 plaintiff felt it was ready to narrow its choices to a specific property for phosphate production in the Intermountain area. At that time elemental phosphorus was not being produced in the Inter-mountain area but was being produced by the electric furnace method in Florida and Tennessee.
14. In November 1946, Mr. J. R. Simplot contacted plaintiff and informed plaintiff of the phosphate rock and shale deposits on the Fort Hall Indian Reservation near Pocatello, Idaho, of which he was the lessee. The phosphate shale and the phosphate rock both contained the same phosphate mineral, but differed as to grade, quality, physical characteristics, and impurity content.
15. The phosphate rock and shale deposits on the Fort Hall Indian Reservation strike through the foothills at an angle slightly below the horizon, while the hills are steadily rising above it. Consequently the phosphate rock and shale deposits outcrop at the lower slope of the foothills and extend beneath the rising hills to a great depth below the surface of the ground. The deposits lie on top of the geologic member called the Wells Limestone Formation, which is several thousand feet thick and follows the same slope as the deposits.
16. The geological formation of the phosphate rock and shale deposits is such that the deposits consist of two separate mineral deposits, with a clear demarcation between the two. The main bed, consisting of phosphate material assaying at 30 percent to 36 percent P205 and averaging 31.6 percent P206 (hereinafter referred to for purposes of convenience as “phosphate rock”) lies in a stratum approximately 6 feet thick immediately above the Wells Limestone Formation. Above this stratum of phosphate rock is a demarcation between such phosphate material and the phosphate material assaying at less than 30 percent P206 (hereinafter referred to *336 for purposes of convenience as “phosphate shale”) marked by a layer of siliceous limestone from 3 to 5 feet thick known as cap rock. Above the cap rock and up to a point where another layer of siliceous limestone, known as false cap rock, is encountered, lies a stratum of phosphate material approximately 20 to 40 feet thick assaying at 22 percent to 28 percent P206 and averaging 24 percent P205 (hereinafter referred to for purposes of convenience as “furnace grade shale”). Above the false cap rock and up to a point where overburden is encountered lie various strata of phosphate material assaying at below 20 percent P2Os (hereinafter referred to for purposes of convenience as “mill shale”). Probably due to geological disturbances, in some instances a thin layer of mill shale is found below the false cap rock in between two layers of furnace grade shale, and a thin layer of furnace grade shale is found above the false cap rock in between two layers of mill shale. However, the phosphate rock is always separated from the furnace grade shale by a layer of cap rock, and each layer of mill shale, false cap rock, furnace grade shale, cap rock and phosphate rock are well defined from one another and can be identified in place.
17. In 1944, Simplot decided to enter the fertilizer business. Assisted by an RFC loan, he proceeded to build at Pocatello, Idaho, a plant designed to produce single super-phosphate fertilizer from sulphuric acid and phosphate rock. Simplot’s investment in the fertilizer plant and equipment was as follows:

*337 Simplot’s total investment in the fertilizer plant came to $1,082,059.88 by the end of 1949 and $4,553,446.92 by the end of 1959.
The plant commenced operation in December 1944. It had an annual capacity of 60,000 tons of superphosphate and required about 36,000 tons of phosphate rock each year.
At first, Simplot purchased the phosphate rock but early in 1945 he sought to secure phosphate rock deposits from which he could mine the rock required for his fertilizer plant. In the summer or fall of 1945, Simplot located an outcrop of phosphate rock on the Fort Hall Indian Reservation near Pocatello. He retained a professor of geology to make a report on the Fort Hall deposits. The report was encouraging, and in October 1945 the Simplot Fertilizer Company applied to the Fort Hall Indian Agency for a mineral lease on 360 acres of the reservation which would permit it to conduct open-pit mining of phosphate rock. (For convenience, reference to “Simplot” shall include reference to Mr. J. R. Simplot and his two companies, Simplot Fertilizer Company and J. R. Simplot Company.)
18. Simplot subsequently made a similar application with respect to an additional 600 acres of such land, and effective June 17,1946, the Department of the Interior approved leases of 960 acres within the Fort Hall Indian Reservation to Simplot as lessee for the purpose of prospecting for and mining “phosphate ore.” These leases were for a term of 3 years and provided for a royalty of 10 percent of the value of the “ore” at the point of shipment (the mine), but not less than 30 cents per ton of 2,000 pounds. This royalty was payable regardless of the P205 content of the material mined and shipped.
19. In late 1945 or early 1946, Simplot hired one George McHugh, a geologist and mining engineer, to manage his Fort Hall mining operation. In the spring of 1946, two additional mining engineers were hired to assist McHugh. In April 1946, Simplot commenced a drilling program to explore the phosphate deposits at Fort Hall..
Because Simplot could not in 1946 obtain mining equipment because of post-war economic conditions, Simplot retained an independent contractor, the Wood and Moffett *338 Construction Company, to do the stripping, mining, and trucking of phosphate rock at Fort Hall during the summer of 1946. On June 19, 1946, mining operations were commenced at Fort Hall at a point located approximately 29 miles northeast of Pocatello. The mine was named the Gay Mine.
During the summer of 1946, 68,268 tons of phosphate rock were mined at the Gay Mine and trucked to Simplot’s fertilizer plant at Pocatello. In the mining operation the overburden and the layers of phosphate shale were stripped off to get down to the phosphate rock. The phosphate shale had too low a P205 content to be utilized in making fertilizer, and was piled separately from the overburden on the ground near the mine, with a view to some then undetermined future use.
20. The phosphate rock initially mined was rock which outcropped or was close to the surface of the ground. As mining progressed, more and more phosphate shale and overburden had to be mined and removed to get down to the phosphate rock. In the 1946 mining operations, it became apparent to Simplot that it would become uneconomical to mine the phosphate rock at deeper levels by removal of excessive amounts of overlying shale and other materials, and that utilization of the phosphate shale was necessary for extended economical mining of phosphate rock from the Gay Mine.
21. Two separate and unrelated methods of utilizing the phosphate shale were considered by Simplot. The first involved the beneficiation of the shale so that the P205 content would be increased enough for use in making fertilizer. The second involved the processing of the shale in an electric furnace to extract elemental phosphorus for use in making phosphate chemicals. Both methods required the construction of costly processing facilities which would involve a very substantial investment.
22. Shortly before July 2, 1946, Simplot advised the Interior Department representatives at Fort Hall that he desired to lease additional acreage at Fort Hall. In August 1946, Simplot applied to the Fort Hall Agency for a waiver by the Secretary of the Interior of the 960-acre phosphate *339 lease limitation of section 189.13 of Title 25 of the Code of Federal Regulations then in effect and of the 10-year limitation on the term of phosphate leases of tribal lands and the 15-year limitation on the term of phosphate leases of allotted lands prescribed by sections 189.12 and 186.10, respectively, of Title 25 of the Code of Federal Regulations then in effect, for permission to lease a total of 2,500 acres within the Fort Hall Reservation, and for the extension of the term of his leases to 25 years.
23. In his correspondence with the Department of the Interior Simplot indicated that he considered the electric furnace method preferable, and he urged the necessity of sufficient phosphate shale reserves to permit the recovery of the multimillion dollar investment which would be required for the construction of an electric furnace to utilize the phosphate shale as justification for his request for leases of additional acreage and for a longer term.
24. After investigation, the Secretary of the Interior on December 10,1946, by endorsing his approval on the written recommendations of the Commissioner of Indian Affairs, waived the acreage and term restrictions and authorized the negotiation with Simplot of leases covering up to 2,500 acres of Fort Hall lands for a term of 10 years and as long thereafter as phosphate ores are produced in paying quantities, but in no event to extend beyond a certain date to be fixed at 25 years from date of approval of the leases, with royalties for phosphate rock at 10 percent of its value at the mine, but not less than 30 cents per short ton, and royalties for phosphate shale at 10 percent of the value of the shale at the mine for all shale used, at a stated value of $1 per short ton at the mine.
25. Negotiation of additional leases to bring Simplot’s holdings on the Fort Hall Reservation up to 2,500 acres was begun with the making of a formal application by Simplot on January 20, 1947, covering certain specifically listed parcels of property.
During the fall and winter of 1946, Simplot investigated the possibility of constructing an electric furnace to utilize the phosphate shale. A trip was made to the TVA to inspect the electric furnace there which was producing *340 elemental phosphorus. Simplot discussed with TVA personnel the possibility of testing the phosphate shale from the Gay Mine to determine its suitability for processing in an electric furnace to produce elemental phosphorus. Thereafter, in response to a written inquiry from Simplot’s chief engineer, dated October 7, 1946, the TVA advised Simplot that it would provide at no c,ost to TVA an electric furnace test run of phosphate rock and shale to be furnished by Simplot, suggesting that such test would require about 560 tons of furnace charge.
Under date of December 19,1946, Simplot’s chief engineer submitted to Simplot a detailed estimate of the cost of constructing an electric furnace for production of fertilizer. In January 1947, this same engineer made a trip to Portland, Oregon, and discussed his estimate with officials of the Bonneville Power Administration, familiar with electric furnace operations.
26, Prior to the time Simplot contacted plaintiff in November 1946, Simplot had estimated the costs of constructing an electric furnace project for the utilization of the phosphate shale at $2,500,000 or $3,500,000. Simplot did not have the funds required to construct such an installation. On the basis of the higher estimate, Simplot discussed financing of such a project with Blythe & Company, offered to provide $1,000,000 of the costs, but rejected that company’s three or four proposals concerning arrangements for financing the balance. Simplot had also contacted Monsanto Chemical Company about building an electric furnace to utilize the phosphate shale in its chemical operations, but Monsanto was not interested. Simplot had also contacted General Chemical, a division of Allied Chemical, about building an electric furnace to utilize the phosphate shale in its chemical operations; General Chemical expressed some interest but took no action.
27. When Simplot contacted plaintiff on November 25, 1946, plaintiff expressed an interest in the phosphate shale in the Fort Hall deposits and in December 1946, sent one of its mining engineers to examine the deposits in detail and send sample specimens to its Carteret plant for chemical analysis. The analyses of the sample specimens indicated that the *341 phosphate shale was theoretically suitable for utilization in an electric furnace. However, whether or not the phosphate shale was actually suitable could be determined only by an actual test on a large scale in an electric furnace. At that time there were no electric furnaces in the Intermountain area and no one had extracted elemental phosphorus from western phosphate shale.
28. In March 1947, plaintiff decided to go ahead and make a full-scale investigation of the practicality and economics of establishing an electric furnace operation for the extraction of elemental phosphorus from the Fort Hall phosphate shale to meet its needs for elemental phosphorus at its Carteret plant. This involved a determination of the quantity and the physical and chemical quality of the phosphate shale in the deposits, the development of a contractual arrangement (designated as a “proper lease and/or supply contract” by plaintiff’s executive vice-president in his March 2, 1947, report to plaintiff’s president concerning development of elemental phosphorus production by use of the Fort Hall phosphate shales) providing plaintiff sufficient reserves of shale in place which could be mined at a cost plaintiff felt economically feasible and which would justify a multimillion dollar investment by plaintiff in facilities to process the shale, the development of a power contract, the development of a contract covering the construction and operation of a spur railroad track from the mining area to the main line of the railroad at Fort Hall, the choice of a site for the processing facilities, the determination of the capital needed, and the development of an adequate supply of minor raw materials used in the processing of the phosphate shale.
29o At this time Simplot was continuing diamond drilling begun in 1946 to determine the extent of the phosphate rock and shale reserves. In April 1947, several of plaintiff’s engineers made a 2-day visit to the Gay Mine. W. T. Nichols, one of plaintiff’s chemical engineers, was placed in charge of plaintiff’s full scale investigation of the practicality and economics of the elemental phosphorus project with full responsibility for making the determinations set forth in finding 28 above, and the project was called the “Nichols Project” for purposes of plaintiff’s books and records. J. B. *342 Perry, a mining engineer who was at that time manager of plaintiff’s mining operations, was made chief mining engineer of the project, and exercised general supervision over the geological and mining aspects of the investigation. Plaintiff’s staff of mining engineers at Newark, California, and plaintiff’s central engineering department were made available to Mr. Perry for use in the investigation. On or about May 17, 1947, plaintiff assigned E. L. Spencer, a mining engineer, as plaintiff’s resident engineer at the Gay Mine. With Mr. Spencer regularly in attendance, and with others of plaintiff’s engineers from time to time at the Gay Mine, plaintiff observed Simplot’s drilling and mining practices, and made suggestions based on plaintiff’s mining experience gained from its various mining activities.
Cole and Lockwood were hired by plaintiff to make a geological survey of the deposits and an evaluation of the amount of phosphate shale reserves contained therein.
30. Ebasco Services, Inc., was engaged by plaintiff to undertake the preliminary design engineering of the electric furnace project and to prepare a preliminary capital estimate.
31. It very soon became evident to plaintiff that the construction of one electric furnace would be economically unfeasible and that three or four furnaces would be required which would entail a capital investment of between $10,-000,000 and $20,000,000. The Cole and Lockwood geological surveys, the first of which was made in May 1947, disclosed to plaintiff that there were sufficient reserves of furnace grade shale in place to enable plaintiff to operate four furnaces for a minimum of 25 years.
32. Plaintiff sought by various approaches to Simplot to obtain the right to sufficient quantities of phosphate shale in the Fort Hall deposits to assure the plaintiff of the economic success of its contemplated multimillion dollar electric furnace project. Plaintiff discussed with Simplot the outright purchase of Simplot’s interest in the Fort Hall phosphate deposits, but no mutually agreeable price could be reached. A joint venture for phosphorus production was discussed in a day-long session, but no tenable basis for such developed because Mr. Simplot had inadequate funds and would not accept the lesser role to which his contribu *343 tion of funds would entitle him. Operations on the mining lands by both plaintiff and Simplot, pursuant to an appropriate lease or sub-lease, were discussed and rejected because of the impracticability of one party mining the phosphate shale and the other party independently mining the phosphate rock. In March 1947, plaintiff commenced negotiations with Simplot to reach an agreement under which Simplot would perform the mining, sufficient reserves of furnace grade shale would be developed and committed for use only in plaintiff’s proposed furnaces, and Simplot would supply furnace grade shale at plaintiff’s plant site at $1 per ton, including royalty of 10 cents per ton.
33. In March 1947, an informal understanding was reached with Idaho Power Company to supply enough electric power for four furnaces on a 25-year basis at a rate plaintiff felt economically feasible, and a formal agreement as to this was entered into on December 16, 1947, between such company and plaintiff. An adequate supply of the minor raw materials used in processing the furnace grade shale was easily secured by plaintiff. A nearby silica property was available and annual contracts were entered into for the purchase of coke.
34. In March 1947, at the suggestion of Simplot, plaintiff employed O. E. Baum, a Pocatello attorney, who was representing Simplot in the negotiation of his long-term Indian leases with the Department of the Interior, to represent plaintiff in the negotiation of similar leases for plaintiff of peripheral lands on the Fort Hall Eeservation adjacent to those which were being negotiated for Simplot. Since 2,500 acres were the maximum which Simplot could lease, Simplot suggested that plaintiff also lease the maximum in order to prevent the leasing of such acreage by competitors. It was not contemplated that the furnace grade shale covered by plaintiff’s Indian leases would be commercially utilized in plaintiff’s processing facilities, and in fact none was so utilized.
35. Mineral leases of Indian lands had to be approved by the Department of the Interior before becoming effective. Securing this approval involved negotiations with officials at Washington, D.C., as well as at the local level. The *344 Simplot leases were directly negotiated by Simplot’s representatives, particularly by the above-mentioned attorney, O. R.. Baum, but plaintiff conferred with Mr. Baum and the Superintendent of the Fort Hall Indian Reservation and was the active party in having included in the Simplot application for leases the matters concerning the royalty payable on the phosphate shale, and construction and operation of the furnace project by plaintiff rather than Simplot, as related in findings 36 and 37, and in having included in the Simplot leases the agreements with respect to such matters. During the course of negotiations on such matters, plaintiff conferred with Mr. Baum and the Fort Hall Superintendent, and finally approved informally the pertinent provisions prior to execution of the Simplot leases.
36. Plaintiff contemplated that it would bear the royalty to be paid the Indians with respect to the furnace grade shale mined on its behalf by Simplot and transported to its processing facilities. A royalty of 10 cents a ton in respect of the phosphate shale mined and shipped was agreeable to plaintiff. A standard Government provision in long-term Indian mining leases provided for a royalty adjustment at the end of each successive 10-year period. However, plaintiff wanted to be certain that the shale royalty would remain firm and not be subject to adjustment for 25 years, which period was felt necessary for the recovery of plaintiff’s contemplated multimillion dollar investment in the electric furnace project.
At the request of plaintiff, Simplot proposed that the shale royalty remain unchanged for 25 years, but the Department of Interior would not approve such a provision. After considerable negotiations between Simplot and the Department, during which Simplot conferred with and obtained the approval of plaintiff, the following lease provision was reached and included in the Simplot leases:
(3) For phosphate rock or shale containing less than 30% Pa06 the royalty on that which is mined and processed by the lessee shall be 10 cents per ton for the first 10 years. The royalty on that shale which is sold by the lessee shall be 10% of the sale price at the mine but not less than 100 per ton.
*345 (4) After the tenth year royalties on phosphate shale processed by the lessee will be based on shale values computed from the sale prices of phosphate rock at the mine. In the absence of actual phosphate rock sales, current quotation on phosphate rock from the Oil Paint and Drug Report or other acceptable current quoted prices shall be used as a basis.
The royalties shall be 10% of the computed values or the minimum royalties prescribed below, whichever are higher. The basis for computing royalties shall be the weighted average P205 content of shale used in each royalty period based on air-dry sample. The table below sets forth the minimum royalties and the relative value between phosphate shale of different grades and phosphate rock.

For all phosphate shale sold the royalty shall be 10% of the sale value at the mine but in no event less than 100 per ton.
(5) For purposes of this contract any phosphate rock or snale containing 30% or more of P205 is termed “phosphate rock” whereas any such material containing less than 30% P205 is termed “phosphate shale”. The point of shipment as used herein shall be the mine. A ton as used herein shall be 2,000 pounds.
The royalty for phosphate rock was the same as in the prior short-term leases referred to in finding 18 above and was subject to adjustment at the end of each successive 10-year period.
37. At the outset of the negotiations the proposed form of Simplot long-term leases contained the condition required by the Secretary of the Interior that the “lease shall be subject to cancellation * * * in the event that the lessee fails to install within 15 years * * * an electric furnace project on the Fort Hall Indian Reservation for the processing of phosphate ores.” It was not contemplated that *346 Simplot would construct the electric furnace project. It was contemplated that plaintiff would construct it.
During the negotiations and at the request of plaintiff, Mr. Baum wrote to the Superintendent of the Fort Hall Indian Beservation in a letter dated April 2, 1947, and requested that this provision of the proposed Simplot leases be amended so that all Simplot would be required to do would be to see to it that an electric furnace project would be installed and continued in operation for the processing of phosphate ore from the leased lands, without any requirement that the installation and operation be done by Simplot.
The lease provision reached and included in the Simplot leases was as follows:
8(a) CancelatioN and forfeiture (Continued). This lease shall be subject to cancelation under the provisions of Sec. 3 of this lease in the event the lessee or (his) (their) associates fail to install within 15 years of the approval of this lease an electric furnace project on the Fort Hall Indian Beservation for the processing of phosphate ores.
It was understood by plaintiff, Simplot, and the Department of the Interior that plaintiff was the only party considering the construction of the required electric furnace project, and the term “associates” was used accordingly.
38. The negotiations with the Department of the Interior culminated in the approval, effective July 17, 1947, by the Department of the Interior of leases of 2,285 acres within the Fort Hall Indian Beservation to Simplot as lessee for the purpose of “prospecting for and mining phosphate rock and phosphate shale.” Two additional leases to make up the full 2,500 acres were approved on July 25, 1947, and January 12, 1948, respectively. For purposes of convenience all these leases will be hereinafter referred to as the “1947 Indian leases.” These leases covered substantially the same land covered by the 1946 leases referred to in finding 18 above, which were canceled on July 17,1947, and 1,540 acres of additional land.
39. The 1947 Indian leases contained among others the provisions quoted in findings 36 and 37 and were for a term of 10 years from the date of approval, and as long thereafter as phosphate rock is produced in paying quantities.
*347 40. By August 1947, plaintiff had decided that due to adverse water, weather, and labor supply conditions at the mining area, it would be necessary to locate the electric furnace project off the Fort Hall Indian Beservation. At the request of plaintiff, Simplot made application to the Department of the Interior for modification of the above-quoted clause 8(a) of the 1947 Indian leases to permit construction of such project “in the vicinity of” rather than “on” such reservation. Plaintiff discussed this proposal with the Superintendent of the Fort Hall Indian Beservation, who advised the Commissioner of Indian Affairs by letter dated September 8,1947, that the matter had been discussed extensively by him with Simplot and plaintiff, that plaintiff actually was the party planning the installation of the electric furnace, that there was no objection to the proposed change in clause 8(a) of the Simplot 1947 Indian leases, and that the corresponding clause in the proposed leases by plaintiff of adjacent lands (hereinafter mentioned in findings 44 and 45) had in fact been prepared for approval to permit construction of the electric furnace project in the vicinity of the reservation.
41. In response to Simplot’s application for amendment of clause 8(a) of the 1947 Indian leases, the Department of the Interior proposed to restrict the proposed electric furnace project to the processing of phosphate shale mined from the Fort Hall Indian Beservation. There was no known deposit of phosphate shale, other than the Fort Hall deposits, from which shale could be economically provided to be processed in the proposed project. The Department of the Interior yielded on this proposed restriction.
42. On January 12, 1948, clause 8(a) of the 1947 Indian leases was modified to permit installation of the required electric furnace project “on or in the vicinity” of the Fort Hall Beservation. Prior thereto, plaintiff had engaged in preliminary negotiations and taken an option to purchase, but thereafter plaintiff completed arrangements and purchased the property for its proposed electric furnace project, located on the outskirts of Pocatello, Idaho, next to the Simplot fertilizer plant, on the Oregon Short Line branch of the Union Pacific Bailroad.
*348 43.Construction of each of plaintiff’s electric furnaces with accessory processing facilities for each, was commenced and completed as follows: First furnace, July 1948 and August 1949; second, January 1949 and August 1950; third, September 1950 and May 1951; and fourth, September 1951 and July 1958. In connection with construction of these electric furnaces and accessory processing facilities, plaintiff incurred the following expenditures:

44. Since the phosphate deposit extended within the Fort Hall Reservation for more than the 2,500 acres maximum which Simplot could lease, Simplot in February 1947, suggested that plaintiff also lease the maximum it could in order to prevent the leasing of such acreage by competitors. It was contemplated that only the furnace grade shale from the Simplot leases would be utilized in plaintiff’s processing facilities. It was not contemplated that the furnace grade shale from plaintiff’s Indian leases would be utilized in plaintiff’s processing facilities. The application for such leases was made by plaintiff while the provisions of the 1947 Indian leases were being negotiated. Leases of 2,500 acres of phosphate-bearing lands within the Fort Hall Indian Reservation to plaintiff as lessee were subsequently approved by the Department of the Interior on June 10, 1948.
45. The term, royalty, and forfeiture provisions of plaintiff’s leases were the same as those contained in the 1947 Indian leases. The 1947 Indian leases covered the heart of the phosphate deposits while plaintiff’s leases covered peripheral areas where the phosphate material was less accessible.
*349 46. All of the phosphate shale processed in plaintiff’s processing facilities has been produced from the 1947 Indian leases with the exception of a nominal amount in 1956 which was mined from plaintiff’s leases during the course of exploration and was processed solely for testing and experimental purposes.
47. During the negotiations with the Department of the Interior for the 1947 Indian leases, plaintiff and Simplot were negotiating the agreement whereby plaintiff would undertake the electric furnace project and utilize the phosphate shale mined by Simplot from the lands covered by the 1947 Indian leases.
48. Plaintiff’s economic studies indicated that its proposed elemental phosphorus operation would be economically feasible if plaintiff acquired the right to sufficient reserves of furnace grade shale in place in the lands covered by the 1947 leases, to provide a 25-year supply of such shale, and if such shale were mined at a maximum cost to plaintiff of $1 per ton plus a maximum Indian royalty of 10 cents per ton. In plaintiff’s negotiation of its agreement with Simplot, plaintiff’s basic considerations were that sufficient reserves of furnace grade shale in place be committed for utilization in plaintiff’s processing facilities, that Simplot would mine the reserved furnace grade shale exclusively for plaintiff, that plaintiff would pay Simplot $1 per ton for the furnace grade shale mined by Simplot, that plaintiff would bear an Indian royalty of 10 cents per ton on the shale mined, and that the agreement would be compatible with the 1947 Indian leases.
49. The negotiations between plaintiff and Simplot culminated in an agreement executed by them on November 24, 1947, hereinafter referred to as the “1947 Simplot agreement.” This agreement contained the following words on its cover: “Agreement for purchase and sale of phosphatic shale from the Fort Hall Indian Reservation.”
Because the 1947 Simplot agreement had been placed in final form rather hastily at the end of 12 days of concentrated negotiations, it contained typographical and other minor errors in form. To correct such errors, a revised agreement was executed by plaintiff and Simplot on March 29,1948, hereinafter referred to as the “1948 Simplot agree *350 ment,” bearing on its cover page the following words: “Being a revision of a certain agreement for purchase and sale of phosphatic shale from the Fort Hall Indian Eeservation dated November 24,1947.”
When the 1947 Simplot agreement was in the final stages of negotiation, plaintiff and Simplot conferred concerning it with the Assistant Secretary of the Interior at Washington, D.C. After its execution, it was submitted to the Secretary of the Interior for his approval, and such approval was accorded on December 5,1947.
On May 26, 1948, the 1948 Simplot agreement was submitted to the Secretary of the Interior for approval, but the Secretary considered approval by him was not necessary since no changes of substance were made in the 1947 Simplot agreement.
A photostatic copy of the 1947 Simplot agreement is in evidence as Exhibit TTT attached to the stipulation of facts, filed July 19,1960, and a true copy of the 1948 Simplot agreement is printed as a part of plaintiff’s petition, attached thereto as Exhibit C. The terms of the 1948 Simplot agreement are made a part of these findings of fact as if fully set forth herein.
Unless specifically stated to the contrary, the hereinafter quoted or summarized provisions of the 1948 Simplot agreement are the same as those contained in the 1947 Simplot agreement.
50. Article II of the 1948 Simplot agreement, entitled “sale AND PURCHASE OP PHOSPHATIC SHALE,” provides as follows:
Section 1. Simplot hereby agrees to sell and deliver to Westvaco and Westvaco hereby agrees to purchase from Simplot and pay for phosphatic shale of the quality, in the quantity, at the price and upon the terms and conditions hereinafter specified.
Section 2. Delivery of phosphatic shale by Simplot to Westvaco as hereinafter provided shall commence upon written notice prior to April, 1948, by Westvaco to Simplot of the quantity of phosphatic shale to be required during the year commencing May 1,1948. Said notice may be modified from time to time by Westvaco prior to September, 1948, but said modification notices may not increase the quantity to be delivered without written consent of Simplot.
*351 Section 3. The quantity of phosphatic shale covered by this Agreement shall be the entire requirements of Westvaco of phosphatic shale at its plant near Pocatello, Idaho, for production of elemental phosphorus to be used in its chemical business other than for fertilizers, presently estimated to be one hundred thousand (100,-000) to one hundred thirty thousand (130,000) tons of phosphatic shale per annum per electric furnace of approximately thirteen thousand (13,000) to fifteen thousand (15,000) kilowatts capacity. Westvaco presently plans to install one (1) furnace and if in its opinion the operation of said furnace is technically and economically successful, to install additional furnaces from time to time.
Section 4- In order to protect Westvaco’s operations with adequate reserves of material for operation of its furnaces, Simplot, during the term of this Agreement, shall not knowingly sell or furnish others with phos-phatic shale or phosphate rock for any purpose other than for the production of fertilizers nor will it use phosphatic shale or phosphate rock in its own operations other than for the production of fertilizers.
Among other definitions contained in Article I of the 1948 Simplot agreement is the following:
The term “selling price” when used herein shall mean either the payment of one dollar ($1.) per ton exclusive of royalties made by Westvaco to Simplot or the aggregate of the whole mine costs plus the profit which West-vaco may pay to Simplot under the conditions outlined in Section 3(a) of Article IY.
This definition was not contained in the 1947 Simplot agreement.
Language of “purchase” and “sale” of phosphatic shale is used throughout the 1948 Simplot agreement, with examples being “phosphatic shale sold to Westvaco hereunder,” “the selling price of said * * * phosphatic shale,” “Westvaco shall pay Simplot for phosphatic shale purchased hereunder,” and “material sold hereunder shall be delivered in bulk carload lots.”
51. Section 2 of Article YII entitled “oke Reserves,” of the 1948 Simplot agreement provides as follows:
Section 2. Simplot shall promptly upon the execution of this Agreement set aside with the written approval of Westvaco from among the lands embraced within the *352 mining leases held by Simplot within the Fort Hall Indian Reservation a sufficient area of proven reserves (as determined by existing geological surveys of Simplot) of usable shale to provide seven million eight hundred thousand (7,800,000) tons of phosphatic shale containing in excess of twenty-four per cent (24.0%) P205 calculated on a moisture-free basis. The area to be set aside is specified tentatively in the map attached hereto and made a part hereof, marked Exhibit A, but shall be subject to revision from time to time by mutual agreement of the parties. Said acreage shall be solely and exclusively devoted to the production of phosphatic shale for sale to Westvaco, but Simplot shall have the right to extract the phosphate rock from said lands and to use the phosphate rock as herein provided. In the event Simplot requires said phosphate rock prior to the time the associated phosphatic shale is required by Westvaco, Simplot may remove said phosphate rock and stockpile said phosphatic shale for Westvaco under conditions that will preserve it in a miner-like fashion from chemical or physical deterioration.
In the event Westvaco shall not initiate construction of its first electric furnace in Idaho within two (2) years from the date hereof, said lands hereinabove, reserved are automatically released to Simplot and this Agreement shall be of no further force or effect; in the event a second furnace is not initiated within five (5) years from the date hereof, lands containing the difference between five million two hundred thousand (5,200,000). tons and two hundred (200) tons of usable shale per kilowatt of designed electric furnace capacity then installed or initiated by Westvaco shall be released to Simplot; and in the event a third furnace is not initiated within ten (10) years, lands so set aside containing the difference between seven million eight hundred thousand (7,800,000) tons and two hundred (200) tons of usable shale per kilowatt designed electric furnace capacity then installed or initiated by Westvaco shall be released to Simplot.
This section differs from the same section contained in the 1947 Simplot agreement only in that the words “with the written approval of Westvaco” were inserted in the first sentence when revision was made.
Section 5 of the same article provides as follows:
Section 6. In the event that Westvaco shall at any time during the term of this Agreement install or initiate construction of electric furnaces having in excess of *353 thirty nine thousand (39,000) kilowatts designed electric furnace capacity, then and in that event Westvaco may, for each such additional kilowatt increased capacity, in addition to the lands specified in Section 2 of this Article, reserve an additional area containing two hundred (200) tons of usable shale per kilowatt of said additional furnace capacity to guaranty delivery of phosphatic shale for such additional electric furnace capacity. The reservation shall be made promptly upon written advice from Westvaco to Simplot of its intention to initiate installation of the additional capacity and the additional lands set aside shall be approved in writing by Westvaco. When set aside, such additional lands shall be subject to all the provisions of this Agreement.
This section differs from the same section contained in the 1947 agreement only in that the word “lands”- in the first sentence is used in lieu of “areas”, and is also used in the second and third sentences in lieu of “ore reserve.”
Plaintiff’s 1947 calculations were that 200 tons of furnace grade shale would provide a 25-year supply for each kilowatt of furnace capacity. The purpose of the “ore reserve” provisions was to set aside for plaintiff areas of proven phosphate shale deposits in sufficient quantities to provide plaintiff furnace grade shale for 25 years of operation of its proposed furnace project, the period of time plaintiff considered necessary to recover its capital investment in such project. In their negotiations, plaintiff and Simplot plainly understood that Simplot could not divert the phosphate shale in such reserves to any party other than plaintiff, and that if Simplot needed phosphate rock from a reserved area before the phosphate shale therefrom was required by plaintiff, Simplot would have to stockpile such shale for plaintiff.
52. In January 1948, the areas containing the reservation for plaintiff of 7,800,000 tons of furnace grade shale in place were designated on a map which was attached to the 1947 Simplot agreement. The designation consisted of two irregularly shaped areas described by metes and bounds determined by actual survey within the southern portion of the Gay Mine which had been well explored and which contained 6,500,000 tons of proven reserves of furnace grade shale in place. Since the northern portion of the Gay Mine had not then been well explored, all the shale contained *354 in the entire northern portion was reserved for plaintiff until a specific area containing 1,300,000 tons of proven reserves could be definitely determined and surveyed.
53. Upon the completion of the construction of two electric furnaces with a designed capacity of 32,000 kilowatts and the initiation of the construction of a third furnace with a designed capacity of 17,000 kilowatts, plaintiff on January 22, 1951, requested that an additional 2,000,000 tons of furnace grade shale be set aside and reserved for plaintiff and that the designation of additional areas containing said shale be made. Upon the initiation of construction of a fourth and a fifth furnace, with a designed capacity of 25,000 kilowatts each, plaintiff, on February 7,1951, requested that a further 10,000,000 tons of furnace grade shale be set aside and reserved for plaintiff and that the designation of further areas containing said shale be made.
54. On March 20, 1951, Simplot designated additional areas containing proven reserves of 3,149,672 tons of furnace grade shale, based on exploration since the first reservation, in respect of the third furnace and the additional 1,300,000 tons to be proven under the first reservation referred to in finding 52 above. Simplot also advised plaintiff that all of the shale contained in the entire remaining area leased under the 1947 Indian leases was reserved for plaintiff in respect of its fourth and fifth furnaces until specific areas containing the required tonnages of proven reserves could be definitely determined and surveyed.
55. On March 11, 1952, plaintiff notified Simplot that plaintiff had decided to postpone completion of the fifth furnace and that no reservation in respect of it would be necessary at that time. The fifth furnace was never completed. Instead plaintiff chose to increase the capacity of its four existing furnaces.
56. On March 11, 1952, plaintiff also requested Simplot to complete the exploration of the remaining area under the 1947 Indian leases so that the reserves of furnace grade shale required for the fourth furnace could be established and proven. A controversy arose as to whose responsibility it was to conduct the exploration necessary to determine the extent of such reserves. The controversy was resolved by *355 plaintiff and Simplot agreeing to conduct a joint drilling program, half of the cost of which, would be paid by each. This drilling program was conducted in 1953. Although there was some difference of opinion as to the amount of reserves indicated by the drilling program, the total reserves were insufficient to cover the reservations to which plaintiff was entitled at the time the drilling program was completed. On February 3, 1956, plaintiff notified Simplot of its approval of the designation of all the remaining areas containing furnace grade shale under the 1947 Indian leases and of the reservation and setting aside for plaintiff of all the furnace grade shale contained therein. At that time the total capacity of plaintiff’s four electric furnaces was 102,000 kilowatts.
57. Section 7 of Article IV, entitled “shipting instettc-tioNS AND payment,” of the 1948 Simplot agreement provides in part as follows:
Section 7. If at any time during the term hereof Sim-plot shall be in default in the performance of any of the terms or conditions of this Agreement which affect or impair the delivery of phosphatic shale to Westvaco as herein provided, and in particular involving the following conditions of default, to wit: (1) failure to deliver as provided herein phosphatic shale in the quantities ordered by Westvaco; (2) a continued delivery of phos-phatic shale which does not conform to the specifications provided in Article III, Section 1, of this Agreement; (3) violation of Westvaco’s reservations by removal of phosphatic shale therefrom for uses or deliveries to persons other than Westvaco, and shall fail to remedy such default within twenty (20) days after written notice thereof, (it being understood that in the event of a violation of provision (3) above, Simplot may remedy such violation by substituting other reservations of usable shale equivalent in quality and quantity and mineable at as low a cost as that removed) or if proceedings in bankruptcy are commenced against Sim-plot, or it is adjudicated a bankrupt, or a receiver is appointed for Simplot, then in any of such events Westvaco shall have the right, in addition to any of its other rights, and in its sole discretion, forthwith to enter and to hold possession of all of the mine or mines of Simplot on the Fort Hall Indian Reservation together with all the appurtenant equipment * * *.
*356 In the event of operations by plaintiff under the above-quoted section, such operations were to be at plaintiff’s expense but without payment of any rental or compensation to Simplot (exclusive of royalties) for furnace grade shale or phosphate rock removed or for use and operation of the mine and equipment.
58. Under Section 4 of Article VII of the 1948 Simplot agreement Simplot also had the right to set aside and reserve for himself 200 tons of furnace grade shale contained in areas not designated for plaintiff for each kilowatt of designed capacity of any electric furnace constructed by him. No such reservation has been made by Simplot. No electric furnace has been constructed by Simplot.
59. Under Section 6 of Article VII of the 1948 Simplot agreement, after 10 years either party had the right to make a further reservation of 200 tons of furnace grade shale for each kilowatt of designed capacity of any electric furnace then in operation or initiated. No reservation has been made under this provision because all the furnace grade shale under the 1947 Indian leases had been reserved for plaintiff before 10 years had elapsed.
60. Section 3 of Article VII of the 1948 Simplot agreement provides as follows:
Section S. Simplot shall have the right at any time to mine phosphatic shale for Westvaco from any other area in the Fort Hall Indian Reservation or shale elsewhere where the selling price thereof f.o.b. Westvaco’s plant will not be in excess of the selling price plus transportation to Westvaco’s plant from area specified in Exhibit A. Any such deliveries from unreserved areas shall release to Simplot a reserved area containing an equivalent quantity of usable shale.
No unreserved furnace grade shale has been mined and shipped by Simplot to plaintiff from any nondesignated area. No designated area or portion thereof has been released to Simplot. Since the execution of the 1947 Simplot agreement, no furnace grade shale has been mined by Simplot under the 1947 Indian leases and used by Simplot in his own operations or shipped to anyone other than plaintiff without plaintiff’s consent.
61. Article XVI of the 1948 Simplot agreement' stated *357 that unless sooner terminated as otherwise provided therein, such agreement would remain in full force and effect until the termination of all of the mining leases held by Simplot in the Fort Hall Indian Reservation. Under Section 1 of Article VII of such agreement, plaintiff had the right to correct any default in and perform any condition necessary to keep the 1947 Indian leases in full force and effect, provided that Simplot was unable or unwilling to do so. Under Section 3(c) of Article IV, plaintiff agreed to reimburse Simplot for royalties paid by Simplot with respect to phos-phatie shale “sold” to plaintiff. Under Sections 2 and 4 of Article XIII, Simplot could terminate the agreement if plaintiff defaulted “in payment for any of the phosphatic shale sold hereunder,” or if plaintiff abandoned for a period of 5 years the manufacture of elemental phosphorus at Pocatello, Idaho.
62. Under Section 3 of Article II and Section 3 of Article IV of the 1948 Simplot agreement Simplot agreed to provide plaintiff’s entire requirements for furnace grade shale at plaintiff’s Pocatello elemental phosphorus plant for $1 per ton in railroad cars at a loading station at the mine, subject to escalation if Simplot’s direct mining costs as defined in Article I of the agreement together with a profit allowance of 10 percent of such costs increased beyond $1 per ton. Under Sections 3 and 5 of Article IV if Simplot on the basis of increased mining costs proposed a price in excess of $1 per ton, plaintiff had the right to accept and pay such increased price or to take possession of and operate the property itself. Under Section 6 of Article IV in the event of such operation of the property by plaintiff, plaintiff would purchase Simplot’s mining equipment, pay Simplot the amount of his unamortized capital investment in the property plus a profit of 10 percent per ton of plaintiff’s whole mine costs, but not less than 10 cents per ton, for furnace grade shale mined and used by plaintiff. Under Section 9 of Article-IV during plaintiff’s operation of the mine Simplot would buy all the phosphate rock plaintiff produced for $3.10 per ton exclusive of the Indian royalties. Under Section 4 and Section 10 of Article IV if Simplot’s price for mining the furnace grade shale for plaintiff exceeded $1 per ton, plaintiff *358 also bad the right to direct mining operations with Simplot’s consent and to purchase furnace grade shale from others or produce it itself from other properties. These provisions were designed to protect plaintiff against Simplot’s incurring mining costs because of inefficiency in mining the furnace grade shale.
63. The agreed price of $1 per ton was not based on consideration of the fair market value of the furnace grade shale but rather on the mining cost involved, plus a gross profit to Simplot of not less than 10 percent.
Under Section 3 of Article IV of the 1948 Simplot agreement this mining cost was calculated by adding together the direct costs of stripping overburden, of mining, crushing, sampling and loading the shale, of stripping the cap rock and mining the phosphate rock. Three dollars per ton of phosphate rock mined was credited against this total cost and the balance was divided by the number of tons of furnace grade shale produced. Calculations based on 1947 economics indicated that the property could be mined to a depth of 194 feet below the surface of the ground before the cost of mining the shale would exceed $1 per ton. Under Article I of the 1948 Simplot agreement furnace grade shale to this point in the deposits was defined as “usable shale” and the reserves of furnace grade shale were expressed in terms of “usable shale.”
64. The price paid by plaintiff to Simplot for furnace grade shale has remained constant at $1 per ton, plus the Indian royalty of 10 cents per ton, and there has been no escalation of such price.
65. The 1947 Simplot agreement was being negotiated by plaintiff and Simplot during the same period of time when the 1947 Indian leases were being negotiated.
Standard clause 3(g) of the Indian leases contained a prohibition against any assignment or subleasing by an operating agreement or otherwise except upon approval of the Secretary of the Interior. In connection with the proposed terms of the 1947 Simplot agreement concerning operation by plaintiff of the mining leases in the event of default by Simplot or in the event of lack of agreement on price escalation, plaintiff requested Simplot’s attorney to *359 consider applying to the Department of the Interior for a rewording of such clause 3(g) to permit such operation of the mining leases by plaintiff. However, Simplot’s attorney advised that it would be difficult, if not impossible, to obtain insertion of a permissive clause of the type needed in the leases, and that the better way to solve the problem was to obtain specific approval by the Secretary of the Interior of the 1947 Simplot agreement, such approval being thereafter obtained, as related in finding 49.
66. The 1948 Simplot agreement was cast in terms of sale by Simplot and purchase by plaintiff of tonnages of furnace grade shale, but the substance of such agreement was that plaintiff thereby acquired reserves of furnace grade shale in place, to be mined and delivered by Simplot to plaintiff at a “price” covering Simplot’s mining costs thereof, plus a 10 percent profit, with Indian royalties on such shale payable by plaintiff.
67. During the years 1949 through 1956 inclusive, the following tonnages of furnace grade shale were mined and delivered to plaintiff by Simplot pursuant to the 1948 Sim-plot agreement and the following amounts were paid to Simplot for mining, crushing and loading the shale, and for Simplot’s mining profit thereon, and for the Indian royalty due in respect of the shale under the 1947 Indian leases:

The railroad weight tonnages and the Indian royalty were calculated on an air-dry basis, while the payments to Simplot for mining, crushing, and loading were calculated on a moisture-free basis.
*360 68. On March 1, 1957, plaintiff and Simplot entered into a Supplemental Agreement which suspended the provisions of the 1948 Simplot agreement. It was understood by plaintiff and Simplot that such Supplemental Agreement would be contingent upon the issuance of a ruling by the Internal Revenue Service that such new contract gave plaintiff an economic interest in the phosphate shale mined for it by Simplot, entitling plaintiff to a depletion allowance thereon, and the Internal Revenue Service so ruled on October 8,1957.
Among, the-whereas clauses of the 1957 agreement, it was stated that the 1948 Simplot agreement provided for the furnishing by Simplot to plaintiff of plaintiff’s entire requirements of phosphatic shale as in said agreement more particularly described; that the 1948 agreement granted no rights to plaintiff in and to the mining equipment and facilities of Simplot and the parties now desire to confer that right on plaintiff; that the 1948 agreement contained no provision for mutual cooperation in the establishment of annual and long-range mining plans designed to preserve and protect ore reserves, and the establishment of plans for the most beneficial removal of such ores; that the parties desire to now grant a sublease in the phosphate shale to plaintiff; and that the 1948 agreement contained no provision for the establishment of mining operations to be conducted by the parties whereby the mining costs would be shared ratably on a tonnage basis, and the parties now desire to so provide.
In the 1957 agreement, plaintiff was granted a sublease of all the mill shale as well as the furnace grade shale under the 1947 Indian leases. As consideration for this sublease, plaintiff agreed to pay to Simplot an annual rental of $320,000. In its above-mentioned ruling, the Internal Revenue Service stated that such annual payment would be deductible, but no decision was made as to whether such deduction “will be treated as an exclusion from ‘gross income from the property’ for percentage depletion purposes (royalty), or as an ordinary and necessary business expense.”
Under the 1957 agreement, Simplot was to continue to mine the phosphate rock as well as the phosphate shale; and in mining the shale for plaintiff Simplot would act as an *361 independent contractor. For such mining plaintiff was to pay a portion of Simplot’s mining costs based on the relative tonnages of phosphate shale and phosphate rock produced. Simplot was to be reimbursed for the cost of certain mining equipment. •
Plaintiff assumed direct liability to the Indian lessors under the 1847 Indian leases and was to pay the royalty in respect of the phosphate shale produced directly to them rather than reimburse Simplot for such payments. Plaintiff had the right to perform any conditions required to keep' the 1947 Indian leases in full force and effect and to cure any default regarding them by Simplot. If plaintiff became dissatisfied with the manner in which Simplot mined the phosphate shale, plaintiff could assume supervision of phosphate shale mining operations. If Simplot failed to deliver shale of proper quality to plaintiff or if plaintiff’s share of the mining costs exceeded $1.35 per ton, plaintiff could operate the property itself. The term of the Supplemental Agreement was for the life of the 1947 Indian leases unless sooner terminated. Either plaintiff or Simplot could terminate the agreement at the end of any mining year if either decided it was uneconomical for it to continue mining operations under the agreement. If plaintiff so terminated the agreement, plaintiff’s interest under the sublease reverted to Simplot and the 1948 Simplot agreement was terminated as well. If Simplot so terminated the agreement, plaintiff had the right to continue under the sublease and operate the property itself without any obligation to Simplot. If plaintiff should default, Simplot had the right to terminate the agreement. If Simplot should default, plaintiff had the right to remain in possession under the sublease and operate the property itself. Plaintiff also had the right to cancel the Supplemental Agreement on 6 months’ notice, whereupon the 1948 Simplot agreement would be reactivated in its entirety.
69= While there was improvement in selective mining techniques, with more money spent on drilling, engineering, equipment, and planning, there was no substantial change in the overall conduct of the mining and delivery by Simplot to plaintiff of the phosphate shale under the 1947 Indian leases after the 1957 Supplemental Agreement was entered into. The same type of equipment and substantially the same min *362 ing methods were employed as under the 1948 Simplot agreement.
70. The actual test drilling of the deposits during 1947 to determine the extent and composition of the deposits was done by Simplot personnel at Simplot’s expense. However, plaintiff stationed one of its mining engineers at the deposits who observed drilling and sampling procedures and collaborated with the Simplot engineers in logging cores, preparing drill samples, mapping and preparing drill logs. Plaintiff’s resident mining engineer also worked jointly with the Simplot engineers in studying open pit faces and sampling them to correlate diamond drill data with actual face conditions.
71. In July and August 1947, a selective mining test pit project was conducted on Nidge A in the southern portion of the property at plaintiff’s request to determine the nature of a typical phosphate shale face, to determine whether or not the furnace grade shale could be mined selectively, to ascertain what the cost of such mining would entail, to determine the value of diamond drilling by correlating the diamond drill data with actual mining, and to acquire representative furnace grade shale for testing. Plaintiff’s resident engineer collaborated with Simplot’s engineers in selecting the area for the test mining project, in face sampling and in mapping the area prior to mining. Actual mining was conducted by Simplot personnel with Simplot equipment. Plaintiff’s resident engineer actively participated in the project by observing, making suggestions as to procedures, assisting in record keeping, sampling, surveying, and in the preparation of a joint report on the project submitted by Simplot’s manager of mines. Plaintiff’s resident engineer also gave technical assistance to the Simplot personnel, indicated which samples were to be taken, and the amount and location of the furnace grade shale to be shipped for analysis and testing.
72. Simplot paid the expenses incurred by Simplot personnel in conducting the test pit selective mining project. Plaintiff paid the expenses incurred by its personnel in the project and in addition paid Simplot the amount of $11,208 as reimbursement of plaintiff’s share of the costs incurred by Simplot.
*363 73. The report of the test pit selective mining project was prepared by Simplot’s manager of mines with the assistance of plaintiff’s resident engineer and incorporated all the then known data on the furnace grade shale reserves as well as projected shale mining costs and the data gathered from the test pit mining project. Also included were independent reserve estimates by plaintiff’s geologists Cole and Lockwood.
74. Although Simplot had discussed with TYA personnel the possibility of testing the phosphate shale to determine its suitability for processing in an electric furnace to produce elemental phosphorus, no such test had been made for Simplot before plaintiff entered the picture, except for chemical analyses of relatively small samples.
75. During the summer and fall of 1947 the TVA conducted a threefold test to determine the suitability of the furnace grade shale for plaintiff at plaintiff’s expense. Such testing consisted of: (a) an examination of a sample of representative shale in great detail and making a chemical analysis; (b) a calcining test; and (c) an electric furnace test of the shale which had been selectively mined during the test pit project. Throughout the testing from two to twelve members of plaintiff’s engineering, technical and operating staffs were in attendance. Plaintiff also tested the phosphate content of the shale in its own laboratories at Newark, California, and also conducted tests there to ascertain whether selectively mined shale could be sintered and nodulized to form a sized material physically suitable for processing in an electric furnace. The results of the TYA tests and the tests conducted by plaintiff in its own laboratories were favorable and indicated that the furnace grade shale could be suitably processed to meet plaintiff’s needs for elemental phosphorus.
76. For said testing of the furnace grade shale plaintiff paid the TYA the amount of $20,772.
77. During 1947 plaintiff hired Cole and Lockwood, a firm of geologists, to make a geological investigation of the deposits under the 1947 Indian leases and an evaluation of the extent of the furnace grade shale reserves contained therein. Upon completion of their investigation they rendered geological reports to plaintiff. For said geological services plaintiff paid them the amount of $3,572.
*364 78. In October 1947, Dr. Seaton, then plaintiff’s executive vice-president who was in charge of plaintiff’s investigation of the feasibility and economics of establishing an electric furnace operation for the extraction of elemental phosphorus from the Fort Hall phosphate shale under the 1947 Indian leases, rendered his report of the investigation to plaintiff’s board of directors. His report indicated the favorable results of the test drilling and the laboratory and TVA testing, the status of the 1947 Indian leases, the “ore supply contract” being negotiated with Simplot, under which firm physical reservations of furnace grade phosphate shale ore of a minimum of 7.5 million tons for plaintiff were provided for, and under which Simplot would mine and deliver such shale to plaintiff at a point reasonably adjacent to the mine at a cost to plaintiff of $1 per ton, the existence of adequate supplies of minor raw materials used in the processing of the shale, the informal understanding reached with Idaho Power Company on a long-term supply of power, the informal understanding reached with Union Pacific on the construction of a spur track from its main line to the Simplot mine, and a recommendation that $10,000,000 be spent on the electric furnace project. Plaintiff’s board of directors authorized and approved the expenditure of $10,000,000 on the electric furnace project on the condition that firm agreements could be reached with Simplot, Idaho Power, and Union Pacific in accordance with the informal understandings set forth in Dr. Seaton’s report. Plaintiff then proceeded to complete its negotiations with Simplot which culminated in the 1947 Simplot agreement, to finalize agreements with Idaho Power and Union Pacific, and to construct the electric furnaces and related processing facilities.
79. Prior to November 1947, Simplot separated the top soil and limestone from all other materials and placed the same in waste dumps, but did not attempt to separate furnace grade shale from other shales, stockpiling all the shales together for possible but undetermined future use, with the exception that some degree of selective mining of phosphate shale (separation of higher-grade shale from lower-grade) was necessarily practiced by Simplot in the fulfillment of the Government contracts to ship phosphatic materials to Japan, as hereinafter related.
*365 Starting in November 1947, Simplot commenced selective mining of furnace grade shale, in accordance with the test pit procedures, and stockpiling the same for future shipment to plaintiff upon completion of its processing facilities.
80. Shipment of furnace grade shale to plaintiff for the production of elemental phosphorus began in May 1949. During the period November 1947, to May 19,1949, plaintiff’s personnel checked periodically on the mining and stockpiling of the furnace grade shale. From time to time during this period small tonnages of furnace grade shale were shipped to plaintiff’s laboratory in Newark, California, for testing there.
Simplot spent the following amounts for buildings and equipment for the Gay Mine:

The mining machinery and related equipment were used at the Gay Mine most of the time but occasionally as needed in Simplot’s mining operations on other properties.
During the years 1948 and 1949 Simplot reimbursed the Idaho Power Company for costs in the amount of $44,570 incurred by the Power Company in the construction of a power line from Fort Hall to the mine. For book and tax purposes Simplot treated these costs as mining costs.
81. To transport the phosphate rock and furnace grade shale about 29 miles from the mine site to their respective processing facilities on the outskirts of Pocatello, plaintiff and Simplot entered into an agreement dated March 22, 1948, with Oregon Short Line Kailroad Company and Union *366 Pacific Nailroad Company concerning the construction maintenance and operation of a spur track 21.52 miles long' from the mining area to the main line of the railroad leading to Pocatello, of 4,000 feet of side track, storage track, and scales. Union Pacific was to bear the cost of construction initially and was to be reimbursed at the rate of 50 cents for each ton of phosphate shale or phosphate rock hauled over the trade. Ownership of the track was in Short Line.
82. The spur track contract was jointly negotiated by plaintiff and Simplot with Mr. Ashby, then president of the Union Pacific. The transportation of plaintiff’s tonnages of furnace grade shale was necessary in order to justify construction of the track. Construction was not economically feasible if only Simplot’s tonnages of phosphate rock were to be transported over it.
83. Union Pacific completed construction of the spur track and related facilities on September 22, 1948, at a total cost of $1,221,913. During the years 1949 through 1954, the railroad was reimbursed by plaintiff and Simplot, plaintiff paying $1,069,928 and Simplot $151,985.
Plaintiff’s share of the total cost of the spur track, including interest, was paid to Union Pacific and was amortized for Federal income tax purposes as follows:

84. Prior to the construction of the spur track the phosphate rock mined by Simplot was transported to his fertilizer plant by truck over an existing road which he had improved for that purpose. All the furnace grade shale which was mined and delivered to plaintiff was transported over the spur track.
85. Under the 1948 Simplot agreement conventional strip *367 ping methods were employed by Simplot to selectively mine the phosphate rock for himself and the furnace grade shale for plaintiff. Mining equipment included power shovels, earthmoving equipment, large trucks and miscellaneous service equipment common to open pit strip mining operations. Sampling, crushing and screening, and loading facilities were located at the loading station at the terminus of the spur track. With the use of profile maps accurately defining each particular area to be mined, overburden and waste were stripped by the mining operator with earthmoving equipment and loaded by large power shovels into trucks and hauled to the dump or to mined-out areas. The mill shale, which was not considered usable, was loaded on trucks and hauled to locations on the property covered by the 1947 Indian leases where it was stockpiled. The furnace grade shale was then mined and hauled to the loading station at the terminus of the rail spur, where it was crushed and screened to a maximum size of 3 inches, after which it was sampled, loaded aboard gondola-type hopper rail cars in lots of about 50 tons per car and transported to plaintiff’s processing plant on the outskirts of Pocatello. After recovery of the layer of furnace grade shale, the next layer, consisting of cap rock, was stripped and hauled to the dump or to mined-out areas. The layer of phosphate rock was then mined, hauled to the loading station and transported by rail to Simplot’s fertilizer plant. A balanced cycle of stripping and mining coordinated the flow of furnace grade shale and phosphate rock from the two separate deposits so as to permit efficient use of common mining, crushing, screening and loading facilities.
86. Although the furnace grade shale and the phosphate rock constituted two separate mineral deposits, because of the geological nature of their physical location it was not feasible for plaintiff to mine the furnace grade shale and Simplot to mine the phosphate rock independently. Because the shale lay on top of the rock and the same type of equipment (shovels and trucks) and mining methods were used to mine both deposits, it was only feasible for the same party to mine the rock and the overlying shale at the same time and with the same men and equipment.
87. After the shipment of furnace grade shale to plaintiff *368 began, plaintiff stationed a man at the mine site to watch the sampling and to observe Simplot’s mining techniques. Various of plaintiff’s mining engineers and geologists also visited the mine site frequently and recommended mining and sampling techniques and practices to Simplot. Although Simplot was not bound to follow the recommendations of plaintiff’s personnel, such recommendations were usually followed by Simplot personnel.
88. Plaintiff’s resident engineer conferred with Simplot engineers concerning planned mining operations, and for the year 1951 submitted written recommendations which were carried out substantially by Simplot. Plaintiff’s resident engineer also participated and aided Simplot in laboratory testing, as well as in continued exploratory drilling for reserves.
89. Pursuant to the 1948 agreement Simplot requested plaintiff’s approval of, and plaintiff approved, an automatic sampler before installing it as part of the crushing and loading equipment at the loading station near the mine. Pursuant to the 1948 agreement during the conduct of mining operations, Simplot requested plaintiff’s approval of, and plaintiff approved, purchases of mining equipment where the expenditure of more than $1,000 was involved.
90. A joint exploration program, consisting of mapping and drilling, was conducted in 1953 on the previously unexplored portions of the property under the 1947 Indian leases to determine the nature and extent of the furnace grade shale and phosphate rock contained therein. Drilling extended over a 5-month period from June 18, to November 18. Two additional weeks were spent on mapping by plaintiff’s personnel. All costs, except - for supervision, transportation, sample analysis and report preparation were shared equally by plaintiff and Simplot. Costs shared equally amounted to $30,896. Plaintiff also incurred additional costs of $8,909. Plaintiff’s total expenditures in connection with the joint exploration program amounted to $24,357.
91. The location of the mine at an elevation of 5,600 feet limited the actual mining of furnace grade shale to the period from May 1 to September 30 each year. Consequently, a full year’s supply of furnace grade shale was mined during the limited mining season and plaintiff generally maintained a *369 stockpile of several hundred thousand tons of furnace grade shale at its processing plant. Any given shipment of shale received by plaintiff by rail was either stockpiled or used directly as best fitted operating schedules.
92. During several weeks before and after the mining season overburden would be stripped and other preparations made as weather permitted for expeditious mining of the deposits for the following season.
93. During the period from January 1, 1946, through February 28, 1950, Simplot incurred costs with respect to the Gay Mine in the following categories and amounts:

Type of expense Amount

Diamond, wagon, and core drilling_$58,491.61
Sampling and assaying_ 22,196.18
Salaries_ 58,183.41
Diving quarters_ 1,250. 00
Camp site- 2, 710.39
Road work_ 158,883.02
Total_ 296,714. 61
Virtually all of the expense items listed above were incurred after mining had begun, and the evidence is not sufficient to establish the extent to which such items were exploration and/or development costs as distinguished from mining costs.
94.In connection with the determination of the nature and extent of reserves of furnace grade shale in place, and in connection with the testing of said shale for chemical and physical suitability for utilization to produce elemental phosphorus, plaintiff made the following expenditures:

95.The capacity of plaintiff’s processing facilities, as designed and constructed, was based on the availability of a 25-year supply of furnace grade shale from the lands covered *370 by the 1947 Indian leases. The sole means of recovery by plaintiff of its multimillion dollar capital investment in these processing facilities was the profitable processing of such furnace grade shale. It was not economically feasible to process furnace grade shale from any other deposit.
96. Plaintiff’s electric furnaces and accessory facilities were massive structures permanently fixed in location. The four electric furnaces were located in a building about 90 feet by 400 feet and 92 feet high. Each furnace was assembled in place, consisted of an enormous steel shell lined with carbon blocks and covered with cement, and enclosed three graphite electrodes about 3 feet in diameter and 9 feet long. The condensers associated with each furnace were steel cylinders about 5 feet in diameter and 30 feet high. The rotary kilns used in the nodulizing process were located in another building somewhat larger than the furnace building which also contained pelletizing and drying equipment. Each kiln consisted of an inclined steel cylinder about 10 feet in diameter and 200 feet long. Each drier chamber consisted of an insulated steel shell 8% feet by 10 feet in cross section and 84 feet long. The pelletizing equipment was also massive and like the furnaces, kilns, condensers and driers was permanently fixed in location. The storage, proportioning, and feed bins located in the various buildings were enormous ones of several hundred tons capacity which were likewise permanently fixed in location. It was and is not economically feasible to move said processing facilities to another location. If the furnace grade shale under the 1947 Indian leases were not available for plaintiff to process in said processing facilities, plaintiff would have to scrap them.
97. During the period in question it was not economically feasible to beneficiate the furnace grade shale under the 1947 Indian leases to utilize it for making fertilizer.
98. During the period in question the only economically feasible utilization of said furnace grade shale was in plaintiff’s said processing facilities.
99. Plaintiff possessed an economic interest in the furnace grade shale mined by Simplot and delivered to plaintiff from the 1947 Indian leases pursuant to the 1948 Simplot agreement.
*371 100. The furnace grade sliale supplied to plaintiff from tbe lands covered by the 1947 Indian leases contained a chemical compound called a fiuorapatite having the chemical formula Ca10(PO4) (F2) from which elemental phosphorus is extracted in the processing facilities. The furnace grade shale also contained silica, lime, alumina, iron and vanadium.
101- At plaintiff’s processing plant on the outskirts of Pocatello, furnace grade shale and coke were received by rail and silica by truck and stockpiled or processed directly as best fitted operating schedules.
102. Upon the commencement of plaintiff’s operations in 1949, the furnace grade shale was removed either from the stockpile at plaintiff’s processing plant or directly from the railroad cars used to transport it from the mine and transported by conveyor belt to kiln feed bins. The furnace grade shale in the kiln feed bins was in the same form as when it was loaded on the railroad cars at the mine. No physical or chemical change had taken place with respect to it.
103. As needed, the furnace grade shale was withdrawn from the bottom of the kiln feed bins into an elevator and fed to the upper end of a rotary kiln. As the kiln rotated at an angle the shale moved through it by gravity flow. The temperature at the lower end of the kiln was between 1,100 and 1,200 degrees centigrade. As the shale moved through the kiln it was slightly melted on the surface and hardened. This process is customarily known as nodulizing. The hot nodules were discharged from the lower end of the kiln into a cooler to reduce their temperature to about 200 degrees centigrade. The purpose of the nodulizing process was to harden the surface of the shale to make it physically suitable for processing in the electric furnace.
104. During the nodulizing process, a chemical change occurred in that fluorine was released from the fiuorapatite which then became tricalcium phosphate.
105. After emerging from the cooler the nodules were screened. Oversized nodules were crushed and rescreened. Undersized nodules were returned to the kiln for reprocessing. Properly sized nodules were transported by conveyor belt to proportioning bins where they were mixed with coke and silica to be fed to the electric furnace. The material fed *372 to the electric furnace consisted of 85 percent nodules, 10 percent coke and 5 percent silica. Accurate proportioning was very critical and improper proportioning of more than one percent would result in a costly malfunction of the furnace.
106. Prior to reaching the proportioning bins the coke was removed either from plaintiff’s stockpile at its plant or directly from the railroad cars used to transport it to plaintiff’s plant and screened, sized and dried. The following specifications were required and were rigidly maintained: at least 86 percent fixed carbon, less than 2 percent moisture, and a size of minus % inch and plus 6 mesh.
107. Prior to reaching the proportioning bins the silica was removed either from plaintiff’s stockpile at its plant or directly from the trucks used to transport it to plaintiff’s plant and sized. The following specifications were required and were rigidly maintained: at least 94 percent Si02 and a size of 2 inches by % inch.
108. Accurately proportioned nodules, coke, and silica were transported by conveyor belt to furnace feed bins from which they were discharged by gravity flow continuously into the electric furnace. Continuous operation of the electric furnace was essential for the production of elemental phosphorus to be economically feasible.
109. In the furnace, electric current was passed through three carbon electrodes immersed in the mixed nodules, coke, and silica. The release of the phosphorus from the trical-cium phosphate contained in the nodules was accomplished by a process that may be visualized as occurring simultaneously in two steps. The silica joined with the impurities and released the phosphorus in oxide form (P205). Carbon, supplied by the electrodes and the coke, joined with the oxygen and released the phosphorus as elemental phosphorus in gaseous form. This process involved chemical changes and is customarily known as reduction and thermal or electric smelting. Molten slag consisting of calcium silicate and ferrophosphorus was tapped from the bottom of the furnace periodically.
110. Since carbon monoxide gas and dust were mixed with the elemental phosphorus as it was produced in gaseous form *373 in the furnace, after the gases were withdrawn from the furnace they were screened through an electrostatic precipitator to remove the dust and were then fed to a cold water condenser where the elemental phosphorus was cooled to the point where it became a liquid and separated from the carbon monoxide gas which was collected and used as plant fuel. The elemental phosphorus in liquid form was pumped into storage tanks from which it was pumped into railroad tank cars for shipment to plaintiff’s phosphate chemical plant at Carteret, New Jersey. Since elemental phosphorus in liquid or solid form bums on contact with air, it was covered with a film of water, with which it does not mix, while in the storage tanks and railroad cars.
111. The above-described processes are the ordinary treatment processes employed by other producers of elemental phosphorus.
112. Pursuant to contracts entered into by and between Simplot and defendant (acting by and through its New York Quartermaster Purchasing Office, War Department) Simplot furnished “phosphate rock” to the United States Army for shipment to Japan for the manufacture of fertilizer. The contracts called for an average grade of 27 percent P2Os. Simplot’s shipments actually averaged 28.18 percent P2O5.
Simplot performed these contracts during the period between February 1947 and June 1948. To do so, Simplot blended phosphate rock averaging 32 percent P205 with selectively mined phosphate shale averaging 23 percent P205. The blending was in the ratio of 3 tons of such phosphate rock to 2 tons of such phosphate shale, accomplished in the loading of each railroad car.
In the performance of these contracts, Simplot supplied 538,000 tons of blended phosphate rock and shale, comprised of 300,000 tons of phosphate rock and 238,000 tons of phosphate shale. Simplot received from $3,685 to $5 per short ton for this blended material f .o.b. Fort Hall.
113. During the years 1949 through 1951, the San Francisco Chemical Company mined and sold phosphate rock of a P205 content of 31 percent or greater. The rock was mined from a phosphoria formation at Leefe, Wyoming, *374 which is approximately 125 miles from Pocatello. The rock was crushed with at least one dimension less than 3 inches in size and some was sold in this form. Some was further pulverized and sold either in bulk or bagged. The sales amounted to approximately 87,000 tons in 1949; 169,000 tons in 1950; and 201,100 tons in 1951.
114. During the time in question no market existed for the furnace grade shale crushed and loaded in railroad cars at the mine site. No significant sales of such shale in that form were made in the vicinity of Pocatello, Idaho, or elsewhere. No quotations existed for such shale in that form. Such shale in that form was a product ready for industrial use or consumption, as shown by plaintiff’s use of the same in its processing plant.
115. During the time in question no market existed for the furnace grade shale in the form of nodules. No significant sales of nodules were made in the vicinity of Pocatello, Idaho, or elsewhere. No quotations existed for nodules. Nodules were a product ready for industrial use or consumption, as shown by plaintiff’s use of the same in its processing plant.
116. Elemental phosphorus is and was both a product ready for industrial use or consumption and a marketable product, quotations therefor existing during the time in question at 17 to 19 cents per pound.
117. In 1951 plaintiff added a pelletizing process to agglomerate the undersize furnace grade phosphate shale fines into pellets of plus % inch and minus 2 inches in size before feeding them into the kiln feed bins. Prior to this time the fines had been fed directly into said bins. The pelletizing operation was a four-step one consisting of mixing the fines with water in a pugmill, further mixing in a muller, shaping the material into balls or pellets of proper size in a pelletizer, and drying the pellets to reduce their moisture content to about 4 percent.
118. No chemical change took place in the shale fines during the four-step pelletizing operation. Apart from the mechanical shaping or molding of the fines into pellets of proper size no physical change took place in the furnace grade shale during said operation. No market existed for the pellets at any stage of said operation or at the conclusion *375 of it. No sales were made of such pellets at any stage of said operation or at the conclusion of it. No quotations existed for such pellets. Such pellets were ready for industrial use or consumption, as shown by plaintiff’s use of the same in its processing plant.
119. In 1956 the four-step pelletizing operation was replaced with a single-step briquette process which performed the same function of mechanically shaping the fines into pellets or briquettes of proper size before they were transported to the kiln feed bins. No chemical change took place in the shale fines during the briquette process. Apart from the mechanical shaping or molding of the fines hato briquettes of proper size, no physical change took place in the furnace grade shale during said process. No market existed for the briquettes resulting from said process. No sales of such briquette were made. No quotations existed for such briquettes. Such briquettes were ready for industrial use or consumption, as shown by plaintiff’s use of the same in its processing plant.
120. During the period 1951-1956 inclusive, approximately 75 percent of plaintiff’s furnace grade shale was put through the pelletizing or the briquette process. The remaining 25 percent went directly to the kiln feed bins. During this period the processing of the furnace grade shale after its entrance into the kiln feed bins up to and including the loading of the elemental phosphorous in railroad tank cars was essentially the same as the processing described in findings 103 through 110.
121. In plaintiff’s processing operations approximately one pound of elemental phosphorus was extracted from fifteen pounds of furnace grade shale. The two critical chemical factors in the suitability of the furnace grade shale for the extraction of elemental phosphorus were its 24 percent P2Os content and the ratio of the silica contained in it as an impurity to the lime also contained in it as an impurity.
122. If the P205 content of the furnace grade shale dropped from 24 percent to 23 percent and the silica-lime ratio remained the same, 23/24ths as much elemental phosphorus would be produced but the operation would be more *376 costly. If the Pz05 content of the furnace grade shale dropped below 22 percent production of elemental phosphorus would not be economically feasible. If material such as Simplot’s phosphate rock with a lower silica-lime ratio were used, so much additional silica would be required to bring the silica-lime ratio to the proper proportion that the operation would not be economically feasible.
123. Elemental phosphorus is a nonmetallic element which freezes or melts, as the case may be, at approximately 44 degrees centigrade and becomes a vapor at approximately 280 degrees centigrade.
124. As defined in recognized chemical dictionaries, the term “smelting” means the melting or fusing of an ore to separate metal therefrom, and the term “ore” means a metal-bearing material.
In the phosphorus or phosphate industry, the term “thermal or electric smelting” is and was extensively used to refer to the electric furnace method of producing elemental phosphorus, as shown by a number of authoritative articles in evidence and by the testimony of defendant’s expert witness.
125. The parties have stipulated that if plaintiff possessed a depletable economic interest in the furnace grade shale mined and delivered to plaintiff in 1949 pursuant to the 1948 Simplot agreement, plaintiff is entitled to compute its allowance for depletion thereon at the rate of 15 percent.
126. The parties have stipulated that if plaintiff possessed a depletable economic interest in the furnace grade shale mined and delivered to plaintiff in 1949 pursuant to the 1948 Simplot agreement, and if the point at which plaintiff’s gross income from mining in respect of such shale is measured for percentage depletion purposes is the elemental phosphorus extracted therefrom and loaded for shipment in railroad tank cars at plaintiff’s Pocatello processing plant, then plaintiff is entitled to an allowance for percentage depletion thereon in the amount of $71,778.
127. The parties have stipulated that if plaintiff possessed a depletable economic interest in said shale, and if the point at which plaintiff’s gross income from mining in respect thereof is measured for percentage depletion purposes is the nodules as they emerged from the kiln, and if the propor *377 tionate profits method is appropriate for allocating costs and profits between mining and nonmining operations in compute ing the value of said nodules, then plaintiff is entitled to an allowance for percentage depletion thereon in the amount of $30,911.
128. The parties have stipulated that if plaintiff possessed a depletable economic interest in said shale, and if the point at which plaintiff’s gross income from mining in respect thereof is measured for percentage depletion purposes is the kiln feed immediately prior to entry into the kiln, and if said proportionate profits method is appropriate in computing the value of said kiln feed, then plaintiff is entitled to an allowance for percentage depletion thereon in the amount of $7,334.
129. The parties have stipulated that if plaintiff possessed a depletable economic interest in said shale and if the point at which plaintiff’s gross income from mining in respect thereof is measured for percentage depletion purposes is said shale loaded for shipment at the Gay mine, and if said proportionate profits method is appropriate in computing the value of said shale so loaded for shipment, then plaintiff is entitled to an allowance for percentage depletion thereon in the amount of $5,893.
CONCLUSION OF LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that plaintiff is entitled to recover, and judgment will be entered to that effect.
The amount of recovery will 'be determined pursuant to Buie 47 (c) (2) of the Buies of this court.
In accordance with the opinion of the court and a memorandum report of the commissioner as to the amount due thereunder, it was ordered on March 14,1966, that judgment be entered for plaintiff in the sum of $2,239.32 as net overpayment of tax and $955.77 as assessed interest thereon, or a total sum of $3,195.09, plus interest, as provided by law.

 Alternatively, plaintiff claims deductions of $30,911, $7,334, or $5,893, depending on the cutoff point arrived at by the court. (Eindings 126 — 129.)

 Both the high grade “rock” and the low grade “shale” are included in the general classification of phosphate rock.

 The taxpayer also leased an additional 2,500 acres, since the maximum Simplot could lease was 2,500 acres. This was to keep competition away. Taxpayer’s leased lands have never been used. (Findings 34 and 44.)

 Findings 41 and 96.

 Finding 49.

 Finding 81.

 Tie applicable statute involved for the tax year in question is the Internal Revenue Code of 1939, Sees. 23 (m) and 114, 53 Stat. 1, 14, 45, as amended, Ch. 63, Sec. 124, 68 Stat. 21, 44 (1943), as amended, Ch. 515, Sec. 15, 61 Stat. 917, 919 (1947).

 See Parsons v. Smith, 359 U.S. 215, 221 (1959), for a note on the various opinions since Palmer.

 Treasury Regulations 111, sec. 29.23 (m)-l (1941), as amended, T.D. 6031, 1953-2 Cum. Bull. 120.

 In the Tax Court opinion, 33 B.T.A. 910 (1936), it -was stated that Bankline -would probably have installed its extensive gasoline plant regardless of whether the gas well in question was available or not.

 “We decide only that where, in the circumstances of this ease, a party essential to the drilling for an extraction of oil has made an indispensable contribution of the use of real property adjacent to the oil deposits in return for a share in the net profits from the production 'of oil, that party has an economic interest which entitles him to depletion on the income thus received.” 350 U.S. 308, 317 (1956).

 See the dissent in Paragon by Mr. Justice Goldberg, in which Mr. Justice Black joined.

 The trial commissioner’s finding 66, ■which the court adopts, states:
“The 1948 Simplot agreement was cast in terms oí sale by Simplot and purchase by plaintiff of tonnages of furnace grade shale, but the substance of such agreement was that plaintiff thereby acquired reserves of furnace grade shale in place, to be mined and delivered by Simplot to plaintiff at a ‘price’ covering Simplot’s mining costs thereof, plus a 10 percent profit, with Indian royalties on such shale payable by plaintiff.”

 This holding is not in conflict with our recent decision in Tidewater Oil Co. v. United States, 168 Ct. Cl. 457, 339 F. 2d 633 (1964). Determinations on tax depletion are made “according to the peculiar conditions in each case * * Section 23(m), Internal Revenue Code 1939. “[I]t is impossible to escape nice distinctions in the application of complicated tax legislation.” Mr. Justice Frankfurter’s separate opinion in Burton-Sutton Oil Co. v. Commissioner, 328 U.S. 25, 38 (1946). The lack of an economic interest in Tidewater was based on several facts which are distinguishable from the instant case : (1) The assignor received none of the oil produced. (2) The investment of the assignors was not necessarily depleted when the transferred allowables were produced. (3) The contribution of the assignor was not essential to continued production, nor to the acquisition of the lease. (4) The interest of the assignor was not measured by the productive life of the oil well. (5) And most important, the assignor did not possess a $20,000,000 investment that was essential to the oil production and that depended for its very existence on the oil in place.

 See footnote 7.

 The term “phosphate rock” used in the Tax Statute is the general classification and it comprises both “rock” and “shale.”

 la 1947 and, 1948, the Simplot Company sold a mixture of rock and shale to the U.S. Army to manufacture fertilizer.

 The Eighth Circuit has recently ruled in United States v. Light Aggregates, Inc., 15 AFTR 2d 674 (1965), that actual marketability is not a prerequisite in determining the cutoff point where the mining process ends. However, whether the cutoff point should be the rough mineral at the mine or at the manufacturing giant was not in issue. The Commissioner placed the cutoff at the plant and the taxpayer placed it at the value of the finished product. In United States v. Portland Cement Co. of Utah, 338 F. 2d 798 (1964), the issue was raised whether the cutoff should be at the mime or at the manufacturing plant. The Tenth Circuit decided on the value of the raw mineral at the mine.